[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————————

No. 04-16230

————————————————————

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 30, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-02211-CV-BE-S

DONNA J. BEAULIEU,

Plaintiff-Appellee,

versus

ALABASTER, CITY OF,
a municipal corporation,
DAVID FRINGS,
Mayor of City of Alabaster,
ALABASTER CITY COUNCIL,
by and through its president, Rick Walters,
CITY OF ALABASTER POLICE DEPARTMENT,
BRIAN BRANDENBERG,

Defendants-Appellants.

————————————————————

Appeal from the United States District Court
for the Northern District of Alabama

————————————————————

**(June 30, 2006)**

Before CARNES, HULL and PRYOR, Circuit Judges.

CARNES, Circuit Judge:

Donna J. Beaulieu is a practicing attorney with a law office in the City of Alabaster, Alabama, a suburban community about seventeen miles south of downtown Birmingham. Her office building is located in the central business district, also known as the B-5 zoning district, and faces U.S. Highway 31, the main commercial thoroughfare that runs through Alabaster's downtown. Beaulieu has a permanent sign on the front of the building that says, "Donna J. Beaulieu, Attorney at Law." The City issued her a permit for the sign in September of 2003.

This case does not involve that sign, at least not directly. It involves another sign that Beaulieu put up on the same property, a political sign urging support for her candidacy for a state judgeship. As a result of that additional sign, Beaulieu was served by the City of Alabaster's code enforcement officer with written notice that she had violated the City's sign ordinance, a notice which gave her ten days to correct the violation "to avoid any further legal action." She sued, and this is the City's appeal from the district court's judgment in her favor. Before we set out the details of the sign ordinance, recount the procedural history of the case, and get into the legal issues, we need to set out the facts that led to the lawsuit.

2

# I.

On April 2, 2004, Beaulieu qualified to run as a candidate for circuit judge in Shelby County, Alabama in the November 2, 2004 general election. She put a campaign sign on the sidewalk in front of her office. It was a stand-alone, upside-down "V"-shaped sign about six feet high and three feet wide with two smaller "Donna J. Beaulieu for Circuit Judge" signs on both sides of it. She did not apply for or obtain a permit for the sign.

On June 18, 2004, Brian Brandenberg of the Alabaster Police Department delivered a notice to Beaulieu's office, informing her that the campaign sign was in violation of section 15.2(E)(1) of the City's sign ordinance. As the City's code enforcement officer, Brandenberg was "familiar" with the sign and zoning ordinances because "it [was his] job to enforce them." The notice stated:

> It has come to the attention of the city that your business is displaying a political sign on your property. This is in violation of the Sign Ordinance with the city of Alabaster. The Sign Ordinance states that political signs may only be displayed in a residential zoning district on property which is improved with a dwelling. This letter serves as a ten (10) calendar day notice to correct these things to avoid any further legal action.

3

Ten days after receiving that notice, Beaulieu removed the campaign sign. She was never formally charged with a violation of the ordinance, and did not file an appeal with the Board of Adjustment.

Thereafter, Beaulieu's husband and campaign manager, Henri N. Beaulieu, Jr., paid a visit to Alabaster City Hall to obtain a copy of the sign ordinance. While waiting for the copies, Mr. Beaulieu talked with Officer Brandenberg, who happened to be standing at the counter. Brandenberg told Mr. Beaulieu that his wife's campaign signs were posted on trees throughout the city and needed to be removed because they violated the sign ordinance.

What else was said is disputed. According to Mr. Beaulieu's affidavit, he asked Brandenberg if he would be breaking the law if he removed the "Donna Beaulieu, Attorney at Law" sign from the front of his wife's office building and replaced it with a "Donna Beaulieu for Judge" sign of the same dimensions. Mr. Beaulieu's affidavit states that Brandenberg told him that such a substitution would be a violation of the ordinance, and when he expressed the opinion that the ordinance was "un-constitutional, it's content based" and that his wife would have to file a lawsuit to get an injunction, Brandenberg replied: "Get in line." Brandenberg, on the other hand, states in his affidavit that he does not recall Mr. Beaulieu asking him specifically about substituting a campaign sign for the

attorney-at-law sign already on the front of the building, but says that "I certainly did not tell him that a substituted message would not be allowed."

## II.

The procedural history of the case and our discussion of the district court's decision will be easier to understand if we precede them with a detailed description of Alabaster's sign and zoning ordinances.

Alabaster's comprehensive zoning ordinance was enacted for the purpose of promoting "public health, safety, morals and general welfare." See Alabaster, Ala., Zoning Ordinance 99-010, Art. II, § 1.0 (Sept. 21, 1999). It consists of twelve articles. See generally id. Article VI divides Alabaster into twenty zoning districts, one of which is the B-5 district or central business district. Id. Art. VI. Article III focuses on administrative procedures and zoning, while Article X deals with signs. Id. Arts. III, X.

On November 3, 2003, the Alabaster City Council adopted a sign ordinance, which amended Article III and Article X of the zoning ordinance. See Alabaster, Ala. Ordinance 03-010 (Nov. 3, 2003). The sign ordinance, which took effect on January 1, 2004, includes among its stated purposes: promoting aesthetics and pedestrian and traffic safety; reducing visual clutter; ensuring that residents are able to "have the opportunity to express their views on public issues through signs

5

located at their residences"; and ensuring that "persons seeking housing in Alabaster can easily find available housing by allowing commercial real estate signs in locations and circumstances where other commercial signs are not allowed." Id. §§ 1.1(4), (5), (9), (10), amending Article X of Ordinance 99-010.[1]

The sign ordinance generally requires a permit from "the Building Official" before a sign is erected or altered. Id. § 2.1. Anyone seeking a permit must submit an application with a drawing showing, among other things, the location and dimensions of the sign. Id. § 2.2. The application must also be accompanied by a fee "as specified by the Building Official for each sign in accordance with this Ordinance." Id. § 2.5. Within seven days of the submission of a completed application, the Building Official must either issue or deny the permit. Id. § 2.3. In the B-5 zoning district, where Beaulieu's office is located, property owners or tenants may obtain a permit for one sign "per facing street" for "[b]usiness or other use." Id. § 8.0(A)(1). The sign may be a "building wall sign, canopy sign, or projecting sign" and must not exceed a certain size. Id. §§ 8.0(A)(2), (3)(a)–(b).

The sign ordinance allows some types of signs, including temporary real estate signs and political campaign signs, to be erected without a permit subject to

---

[1] The record does not include an updated version of the zoning ordinance complete with the amendments from the sign ordinance. Unless otherwise noted, we will cite to the sections as they should appear when incorporated into Article X of the zoning ordinance as amended.

certain conditions.[2]  Id. §§ 15.2(E), 15.3(F)(3).  "Each commercial lot, building or

tenant space may have one real estate 'for sale' or 'for rent' sign, provided such

sign is located on the subject lot or premises" and does not exceed the size

limitations.  Id. § 15.3(F)(3).  Real estate signs must be removed when the

property is sold or rented.  Id.  This is what the ordinance says, in pertinent part,

about political campaign signs:

> The following signs shall be allowed, subject to the following
> conditions, but no sign permit shall be required for such signs:
>
> E.     Political campaign signs, subject to the following:

---

[2] The sign ordinance states that an "[a]pplication for a permit . . . to erect a temporary sign . . . shall be made to the Building Official," and it requires that the application for a temporary sign shall include "the date on which the sign will be erected and the date when the sign shall be removed."  Id. § 2.2, (E).  The City did not, however, argue to the district court that permits were required for temporary real estate signs.  The district court, without any objection from the City that we can find, interpreted the sign ordinance as allowing temporary real estate signs without a permit.

Likewise, in neither of its briefs to this Court did the City argue that the district court erred in its finding that the sign ordinance allowed temporary real estate signs without a permit.  During oral argument we gave the City a number of opportunities to make that argument; instead of doing so, the City seemed to concede that the ordinance did allow temporary real estate signs without a permit.  We will not force an argument on a party and assert for it a position it did not take in the district court or this Court.  See Irving v. Mazda Motor Corp., 136 F.3d 764, 769 (11th Cir. 1998) ("Because Plaintiff failed to make this argument in the district court, we decline to consider it here."); Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489, 1511 n.30 (11th Cir. 1996) (This Court "will not address claims or arguments not fairly presented to the district court."); United States v. Ford, 270 F.3d 1346, 1347 (11th Cir. 2001) ("[O]ur well established rule is that issues and contentions not timely raised in the briefs are deemed abandoned."); United States v. Ardley, 242 F.3d 989, 990 (11th Cir. 2001) ("[W]e apply our well-established rule that issues and contentions not timely raised in the briefs are deemed abandoned.").

7

1. Political signs shall only be located in a residential zoning district on property which is improved with a dwelling.

Id. § 15.2(E)(1).

The sign ordinance also contains a section captioned "Substitution of Messages." Id. § 12.0. It provides that any sign allowed under the ordinance "may contain, in lieu of any other message or copy, any lawful noncommercial message . . . so long as said sign complies with the size, height, area and other requirements of this Ordinance." Id.

If a person wishes to erect a sign that is not allowed in a particular zoning district, he may, after receiving approval from the Board of Adjustment, apply for a "special exception use." See Ordinance 99-010, Art. III, § 3.2. The application, along with a $100 non-refundable fee, must be submitted to the Building Official at least eighteen days prior to the Board of Adjustment meeting at which the request is to be considered. Id. § 3.2(A).

A section of the sign ordinance captioned "Unlawful signs" requires signs to be maintained in sound structural condition. Ordinance 03-010 § 2.7. It authorizes the Building Official to inspect all signs and order the painting, repair, alteration, or removal of any sign that does not comply with the Building Code. Id. The owner of a sign or of the property on which it is located may appeal a

8

removal order to the Board of Adjustment. Id. An appeal suspends enforcement of the order until the Board issues a ruling. Id. The ordinance also authorizes appeals from the denial of a "building permit" by the Building Official. Id. § 2.4. A provision in the zoning ordinance, captioned "Appeals From a Decision of the Board," provides for appeals from decisions of the Board of Adjustment to the circuit court. See Ordinance 99-010, Art. III, § 3.5.

## III.

On July 19, 2004, Beaulieu filed a complaint in the district court against the City of Alabaster, Mayor David Frings, City Council President Rick Walters, the City of Alabaster Police Department, and Officer Brandenberg. Because they all take the same position in this case, we will refer to the defendants collectively as "the City."

Beaulieu's complaint requested a declaratory judgment and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202. It challenged the sign ordinance under 42 U.S.C. § 1983, claiming that it was facially unconstitutional because: (1) it places an undue burden on free speech; (2) it is a content-based regulation because it favors commercial speech over non-commercial speech; (3) it is not justified by a compelling government interest; and (4) even if applied in a content-neutral fashion, "[i]t is not narrowly tailored to further a substantial governmental interest

9

and ample alternative means for communicating the desired message do not exist."

The complaint also claimed that the sign ordinance was unconstitutional as applied to Beaulieu because it violated her First Amendment right to free speech.[3] Following a hearing, the district court entered an order on July 26, 2004, denying preliminary injunctive relief.

Thereafter, the City filed its Brief in Opposition to Plaintiff's Claims for Declaratory and Injunctive Relief, in which it made a number of arguments. One was that Beaulieu's claims were barred because she had never filed an appeal with the Board of Adjustment and therefore had failed to exhaust her state administrative remedies.

The City also argued on the merits that its sign ordinance was constitutional on its face and as applied to Beaulieu. In support of its position, the City submitted the affidavit of Steven Sims, the City's Building Official. Sims gave his view that political signs are not banned from the B-5 zoning district but that property owners in that zone must obtain a permit for a political sign, as they would for most other signs. He said that the permit requirement applies equally to all signs regardless of their content and that permits are issued without regard to

---

[3] Beaulieu's complaint contained other legal theories but she abandoned them before the district court entered its order.

content. He noted that the sign ordinance does exempt some signs from the permit requirement, including political signs posted on property in a residential zoning district if that property has a dwelling on it.

During the bench trial on August 31, 2004, the City introduced the testimony of Dr. Eric Kelly, the drafter of the sign ordinance. Dr. Kelly agreed with Sims' interpretation of the sign ordinance but conceded that the ordinance was unclear and "ought to be fixed." As for section 12.0, he said that the intent was that the substitution message provision would "apply very broadly" and "would let someone take even a real estate sign and place a political message on it." Kelly admitted "[t]hat would be sort of an unusual scenario," though.

On September 24, 2004, the district court entered a final judgment in favor of Beaulieu. Beaulieu v. City of Alabaster, 338 F. Supp. 2d 1268, 1278–79 (N.D. Ala. 2004). In a memorandum opinion the court concluded that Beaulieu's claims were not barred because of her failure to appeal administratively, "because the exhaustion of state administrative remedies is not a prerequisite to filing suit under 42 U.S.C. § 1983." Id. at 1272 (citing Granite State Outdoor Adver., Inc. v. City of Clearwater, Fla., 351 F.3d 1112, 1118, n.5 (11th Cir. 2003)).

The court then addressed whether the two elements of a § 1983 action were present: "(1) whether the conduct complained of was committed by a person

11

acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." Beaulieu, 338 F. Supp. 2d at 1273 (quoting Parratt v. Taylor, 451 U.S. 527, 535, 101 S. Ct. 1908 (1981)) (internal quotation marks omitted). The court found that Beaulieu had established the first element because the sign ordinance was enacted pursuant to the City's municipal authority, and Officer Brandenberg had acted under color of state law when he "cited" Beaulieu for violating the ordinance. Id.

With regard to the second element, the district court first decided that the ordinance was content-based and therefore subject to strict scrutiny. See Beaulieu, 338 F. Supp. 2d at 1273–78. In doing so, the court rejected the City's position that political signs were allowed in the B-5 zoning district via the section 12.0 substitution provision, because that position "does not comport with the clear language of section 15.2(E)(1) . . . nor with the manner in which the City enforced the ordinance." Id. at 1275. The court pointed out that the City's litigation position regarding this provision was undermined by the fact that Sims and Brandenberg, who were both "supposed to know and understand the ordinance," had conflicting interpretations of it. Id.

The district court next examined whether section 15.2(E)(1) violated Beaulieu's First Amendment right to political expression by restricting political campaign signs in the B-5 zoning district. Beaulieu, 338 F. Supp. 2d at 1275. The court reasoned that even taking the substitution provision into account, the sign ordinance still burdened core political speech because in order to display a temporary political sign via substitution, speakers in the B-5 zoning district would have to completely or partially cover up a pre-existing commercial sign announcing the location of their business. Id. at 1276 (citing McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 346–47, 115 S. Ct. 1511 (1995)). The court called this "a proverbial 'Hobson's choice.'" Id. Because section 15.2(E)(1), on its face and as applied, burdened Beaulieu's right to political speech, the court applied strict scrutiny review. Id. It concluded that the City's interests in the promotion of aesthetics and traffic safety, although substantial, were "not sufficiently overriding" to satisfy that heightened level of scrutiny. Id. at 1277.

Alternatively, the court concluded that section 15.2(E)(1) was a content-based restriction on political speech. Beaulieu, 338 F. Supp. 2d at 1277 (citing Sugarman v. Village of Chester, 192 F. Supp. 2d 282, 300 (S.D.N.Y. 2002)). It found that the ordinance favored commercial speech over political speech because it allowed temporary real estate signs to be displayed in the B-5 zoning district

13

without a permit, but did not allow temporary political signs at all, unless they were substituted for a commercial sign. Id. at 1277–78. The court noted that a business owner could simultaneously display one commercial sign with a permit and one "for sale" sign without a permit, but Beaulieu would not be able display both her "Attorney at Law" sign and her temporary campaign sign. Id. The court saw no overriding or compelling state interest that justified this content-based treatment of political signs. Id. at 1278.

As for remedies, the district court enjoined the City from enforcing what it interpreted to be section 15.2(E)(1)'s restriction of political signs to residential property improved with a dwelling. Beaulieu, 338 F. Supp. 2d at 1279. It also ordered the City to treat political signs in the B-5 zoning district the same as temporary real estate signs. Id. In other words, the court ordered the City to allow each business in the B-5 zoning district to erect one temporary political sign without a permit, just as it had always been allowed to erect one temporary real estate sign without a permit. Id. The court held that pursuant to a severance clause, the court's order did not affect the validity of any other portion of the ordinance. Id.

**IV.**

The City contends that the district court erred in finding that Beaulieu's claims were ripe for review in federal court because, it says, she failed to exhaust

14

her administrative remedies. Of course, we review questions of subject matter jurisdiction de novo. Justice Cometh, Ltd. v. Lambert, 426 F.3d 1342, 1343 (11th Cir. 2005).

Specifically, the City argues that Beaulieu's claims are not ripe because she: (1) bypassed Alabaster's administrative appeals process and failed to show how the appeals process would have harmed her; and (2) improperly relied on the statements of Officer Brandenberg to determine what the sign ordinance did and did not allow and failed to obtain a "conclusive response from someone with the knowledge and authority to speak for the City" regarding its ordinance. See Digital Props., Inc. v. City of Plantation, 121 F.3d 586, 590 (11th Cir. 1997).

Beaulieu responds that under Patsy v. Board of Regents of Florida, 457 U.S. 496, 102 S. Ct. 2557 (1982), and Granite State, 351 F.3d 1112, the exhaustion of state administrative remedies is not a prerequisite to filing suit under § 1983. She also argues that even if exhaustion is a prerequisite, it would have been futile for her to file an appeal with the Board of Adjustment because the sign ordinance clearly relegates political signs to residential areas, as the June 18, 2004 notice Brandenberg delivered to her confirms. Beaulieu further asserts that she was discouraged from appealing by Officer Brandenberg's statement to her husband that the City would not allow a substitution of a campaign sign for her "Attorney at Law" sign.

15

Alternatively, Beaulieu contends that if she had applied for and had been given a permit for a campaign sign pursuant to the section 12.0 substitution provision, her First Amendment rights would have been harmed. Her reasoning is that sharing or replacing her "Attorney at Law" sign with a campaign sign would have caused her to suffer a loss of business advertising space. She also argues that she should not have been required to apply for a permit for a political sign since she would not have had been required to apply for one for a real estate sign.

The Supreme Court and this Court have held that there is no requirement that a plaintiff exhaust his administrative remedies before filing suit under § 1983. Patsy, 457 U.S. at 516, 102 S. Ct. at 2568; Greenbriar Ltd. v. City of Alabaster, 881 F.2d 1570, 1574 n.8 (11th Cir. 1989) (citing Patsy). On the basis of those decisions, the district court held that Beaulieu could bring a First Amendment challenge to the sign ordinance pursuant to § 1983 without first exhausting her administrative remedies. Beaulieu, 338 F. Supp. 2d at 1272. Still, Beaulieu's claim must meet constitutional ripeness requirements. See Digital Props., 121 F.3d at 591 n.4 ("Even if we assume, however, that the Supreme Court's decision in Patsy v. Board of Regents, 457 U.S. 496, 102 S. Ct. 2557 (1982), precludes imposing an exhaustion requirement on a First Amendment facial challenge to an ordinance under 42 U.S.C. § 1983, Digital still faces the ripeness hurdle."); see also Greenbriar, 881 F.2d at 1574 n.8 ("The question whether administrative

16

remedies must be exhausted is conceptually distinct . . . from the question whether an administrative action must be final before it is judicially reviewable.") (quoting Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 192, 105 S. Ct. 3108, 3119 (1985)) (internal quotation marks and alteration omitted). We therefore address whether Beaulieu's claim is ripe for review.

Article III of the Constitution limits the jurisdiction of the federal courts to actual cases or controversies and requires us to consider whether a plaintiff's claims are ripe. U.S. Const. Art. III, § 2, cl. 1; Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 808, 123 S. Ct. 2026, 2030 (2003) ("The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction . . . ."); see also Konikov v. Orange County, Fla., 410 F.3d 1317, 1322 (11th Cir. 2005). The ripeness doctrine keeps federal courts from deciding cases prematurely. Digital Props., 121 F.3d at 589. It "protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." Id.; see also Konikov, 410 F.3d at 1322 ("The purpose of this doctrine is to avoid entangling ourselves in abstract disagreements, and also to shield agencies from judicial interaction until an administrative decision has been formalized and its effects felt

in a concrete way by the challenging parties.") (alteration and internal quotation marks omitted). "Courts must resolve . . . whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decisionmaking by the court." Digital Props., 121 F.3d at 589 (internal quotation marks omitted).

To determine whether a claim is ripe we must evaluate: (1) the fitness of the issues for judicial decision"; and (2) "the hardship to the parties of withholding court consideration." Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1315 (11th Cir. 2000) (internal quotation marks omitted). In applying the fitness and hardship prongs we must consider the following factors: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733, 118 S. Ct. 1665, 1670 (1998); see also Ala. Power Co. v. Fed. Energy Regulatory Comm'n, 685 F.2d 1311, 1315 (11th Cir. 1982) (listing four similar factors).

Because this case involves an alleged violation of the First Amendment, our review of this suit's ripeness is at its most permissive. Digital Props., 121 F.3d at

590 ("[T]he injury requirement is most loosely applied when a plaintiff asserts a violation of First Amendment rights based on the enforcement of a law, regulation or policy."); Cheffer v. Reno, 55 F.3d 1517, 1523 n.12 (11th Cir. 1995) ("[T]he doctrine of ripeness is more loosely applied in the First Amendment context."); Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale, 922 F.2d 756, 760 (11th Cir. 1991) ("The injury requirement is most loosely applied—particularly in terms of how directly the injury must result from the challenged governmental action—where [F]irst [A]mendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced.").  We have stated that "[t]he broader the First Amendment right and, therefore the more likely it is that a governmental act will impinge on the [F]irst [A]mendment, the more likely it is that the courts will find a justiciable case when confronted with a challenge to the governmental act."  Id. at 762 n.5 (citing Solomon v. City of Gainesville, 763 F.2d 1212 (11th Cir. 1985); Int'l Soc'y for Krishna Consciousness v. Eaves, 601 F.2d 809 (5th Cir. 1979) (both allowing facial attacks on ordinances of general application)).

This case involves the broadest of First Amendment rights because it concerns the right of a political candidate to publicize her candidacy during the heat of a campaign.  McIntyre, 514 U.S. at 346, 115 S. Ct. at 1518 ("[T]he

19

category of speech regulated by the Ohio statute occupies the core of the protection afforded by the First Amendment: [d]iscussion of public issues and debate on the qualifications of candidates . . . .") (internal quotation marks omitted); Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 223, 109 S. Ct. 1013, 1020 (1989) ("[T]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office.") (internal quotation marks omitted); Buckley v. Valeo, 424 U.S. 1, 14, 96 S. Ct. 61, 632 (1976) ("Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people.") (alteration and internal quotations omitted); Weaver v. Bonner, 309 F.3d 1312, 1319 (11th Cir. 2002) ("A candidate's speech during an election campaign occupies the core of the protection afforded by the First Amendment.") (internal quotation marks omitted); Fed. Election Comm'n v. Pub. Citizen, 268 F.3d 1283, 1287 (11th Cir. 2001) ("Discussing candidates' qualifications and advocating their election or defeat is pure political speech that occupies the core of the First Amendment's protection."). But even though we must apply the ripeness requirement loosely,

20

we may not disregard it altogether. Nat'l Adver. Co. v. City of Miami, 402 F.3d 1335, 1339 (11th Cir. 2005) ("National I") ("[W]hile it is true that our review of a suit's ripeness is at its most permissive in cases concerning putative violations of the First Amendment, that requirement may not be ignored.") (internal citation omitted).

The City urges us to look to two ripeness cases in which this Court dismissed plaintiffs' challenges to municipal ordinances because the lawsuits were filed before the municipal authorities had rejected the permit applications. See National I, 402 F.3d 1335; Digital Props., 121 F.3d 586. Those cases were different, because unlike the present one, they did not involve core political speech. Digital Properties involved speech of a sexually explicit nature, 121 F.3d at 587–88, while National I involved commercial speech, 402 F.3d at 1337. See R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 422, 112 S. Ct. 2538, 2564 (1992) ("Our First Amendment decisions have created a rough hierarchy in the constitutional protection of speech. Core political speech occupies the highest, most protected position; commercial speech and nonobscene, sexually explicit speech are regarded as a sort of second-class expression.") (Stevens, J., joined by White and Blackmun, JJ., concurring in the judgment); Supersign of Boca Raton, Inc. v. City of Fort Lauderdale, 766 F.2d 1528, 1530 (11th Cir. 1985)

("[C]ommercial speech does not receive the same degree of constitutional protection as other forms of constitutionally guaranteed expression, and the former may be forbidden and regulated in situations where the latter may not be."). Even putting aside the difference in the type of speech involved, Digital Properties and National I are still distinguishable.

Digital Properties had plans to open an adult book and video store in the City of Plantation, Florida, and entered into a contract to purchase a building. Digital Props., 121 F.3d at 587–88. The City's master list of business uses did not expressly indicate whether adult book or video stores were permitted or prohibited in the zoning district in which the building was located. Id. at 588. In an effort to obtain a building permit, Digital's architect and counsel went to city hall to file remodeling plans. Id. They spoke with the assistant zoning technician and informed her of Digital's plan to change the use of the building from a restaurant to an adult store. Id. The technician told them that the City did not allow such a use or that the City's Code did not expressly permit such a use in that zoning district and advised them to speak with the director of building and zoning; they left without doing so. Id. at 588–89.

We stated that even assuming that the "zoning scheme could potentially hamper Digital's First Amendment rights," there was no subject matter jurisdiction

to decide whether it did, because Digital "did not pursue its claim with the requisite diligence to show that a mature case or controversy exists." Digital Props., 121 F.3d at 590. We noted that Digital's agents spoke only with one non-supervisory employee before concluding that the ordinance would prevent it from carrying out its plans for the building. Id. We stated that "[a]t a minimum, Digital had the obligation to obtain a conclusive response from someone with the knowledge and authority to speak for the City regarding the application of the zoning scheme to Digital's proposal." Id.

In the other case, National Advertising, a billboard company, applied for permits to erect billboards in a commercial zoning district in the City of Miami. National I, 402 F.3d at 1337–38. City zoning clerks declined to issue the permits because the billboards National wanted to put up would exceed the height limits in the City's sign ordinance. Id. A clerk also told National's agents that billboards were not permitted in the district. Id.

We affirmed the district court's grant of summary judgment to the City on ripeness grounds. National I, 402 F.3d at 1341. First, we found that the issues were not yet fit for judicial decision. Id. at 1339–40. We reasoned that National, like Digital, never pursued its claim through the administrative process available under the ordinance. Id. Because National had failed to obtain a final denial of its

applications, its claim was not ripe. Id. at 1340. We stated that National had the obligation "to obtain a conclusive response from someone with the knowledge and authority to speak for the City regarding the application of the zoning scheme" to the plaintiff's permits. Id. (internal quotation marks omitted). A zoning clerk's verbal statement or written notation on an application that the proposed billboards were "too tall" or "in the wrong zone" is not conclusive evidence of a denial and does not present a dispute of sufficient concreteness for judicial review. Id.

As for the second prong of the ripeness test, we found that National had failed to show that it would sustain undue hardship if the claim were not adjudicated. National I, 402 F.3d at 1341. We believed that it would have been less difficult and would have taken less time for National to have obtained a final written denial of its application "instead of rushing to the federal courts for relief." Id. For those reasons, we affirmed the district court's entry of summary judgment in favor of the City. Id.

Beaulieu's situation is different from that of National and Digital, because Beaulieu had a lot more than a verbal statement from a clerk or a written notation a clerk made on a permit application. Cf. National I, 402 F.3d at 1340. Instead, she had a written notice of violation from Officer Brandenberg, the City's code enforcement officer, a person who had authority to speak for the City regarding

24

the application of its ordinance and who she had every reason to believe was knowledgeable about it.  Cf. id.  The notice could not have been more clear.  It informed Beaulieu that her campaign sign was in violation of section 15.2(E)(1) because "political signs may only be displayed in a residential zoning district on property which is improved with a dwelling," and it gave her ten days to correct the violation or face "further legal action."  The notice was sufficiently conclusive and authoritative to meet the first prong of the ripeness test.  Unlike the claims of National and Digital, Beaulieu's claims are fit for judicial decision.

Turning to the second prong, Beaulieu has also demonstrated that she would have sustained undue hardship if the district court had withheld adjudication of her claim.  On this point we consider the situation of the plaintiffs in Eaves, 601 F.2d 809.[4]  They wanted to solicit donations from passersby in various parts of the Atlanta airport, as they had done before the adoption of a municipal ordinance requiring solicitors to accept donations only at designated booths.  Id. at 817.  Because the plaintiffs obeyed the new ordinance, the City of Atlanta did not take any enforcement actions against them.  See id.  Nonetheless, this Court found that there was an impending injury because the plaintiffs had a "specific, serious, and

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit that were rendered prior to October 1, 1981.

plausible" intent and desire to engage in the prohibited behavior and "[a]ll that stood between the . . . plaintiffs and impending harm was their choice to modify their behavior to conform." Local 2238, 922 F.2d at 762 (discussing Eaves).

Moreover, we found in Eaves that it was likely that had the plaintiffs violated the ordinance, the City would have enforced it against them. Eaves, 601 F.2d at 821. Because the ordinance had been enacted only months earlier, we felt entitled to assume that "law enforcement agencies will not disregard such a recent expression of the legislature's will." Id. at 821. We also found that there would be no benefit to waiting until the factual record was more developed because the record was already sufficient. Id. at 821–22.

Like the Eaves plaintiffs, Beaulieu had a "specific, serious, and plausible" intent and desire to engage in conduct that arguably would violate the ordinance. See Local 2238, 922 F.2d at 762 (discussing Eaves). Beaulieu very much wanted to post a campaign sign on her office property, a practice that, according to the written notice of violation she had received from the City's code enforcement officer, was prohibited by the ordinance. The "further legal action" that the notice threatened would have been especially harmful to Beaulieu because there are some voters who probably would prefer to elect judges who have not been accused of violating the law.

The only thing that prevented the threatened harm was Beaulieu's modification of her behavior to conform to the requirements of the ordinance. See Local 2238, 922 F.2d at 762. If she had not knuckled under, the City likely would have taken the "further legal action" threatened in the written notice that its code enforcement officer had served on her. Additionally, because the ordinance was adopted only seven months before this dispute arose, we may assume that city officials would not have disregarded the will of the City Council as expressed in the ordinance. See Eaves, 601 F.2d at 821. Nor was there any benefit to be gained from waiting for further development of the factual record because the City's views on the meaning of the sign ordinance and its application of the ordinance are already in the record. See id. at 821–22.

Finally, there is one more reason why Beaulieu would have suffered substantial hardship if her claim had not been adjudicated sooner instead of later. She was a candidate for political office. Every day that went by without her political signs up was a lost day of political advertising for her. She sued while her campaign for office was ongoing. She got relief in the form of a permanent injunction before the election. If she had waited for more definitive word from the City, she would have lost the benefit of having her sign up during the latter

part of her campaign. For all of these reasons, we conclude that Beaulieu's claim satisfies both prongs of the ripeness test.

## V.

The City contends that, even if the claim was ripe for decision, the district court should have abstained on prudential grounds from deciding the case. We review only for abuse of discretion a district court's decision whether to abstain. Lops v. Lops, 140 F.3d 927, 942 n.21 (11th Cir. 1998).

The Supreme Court and this Court have held that federal courts should abstain from deciding a case when doing so would interfere with a state criminal proceeding or a state civil or administrative proceeding that is akin to a criminal one. See, e.g., Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 436–37, 102 S. Ct. 2515, 2523–24 (1982) (state bar disciplinary proceedings); Rizzo v. Goode, 423 U.S. 362, 380, 96 S. Ct. 598, 608–9 (1976) (internal disciplinary affairs of municipal and police agencies); Huffman v. Pursue, Ltd., 420 U.S. 592, 604, 95 S. Ct. 1200, 1208 (1975) (state nuisance proceedings); Younger v. Harris, 401 U.S. 37, 53–54, 91 S. Ct. 746, 755 (1971) (state criminal proceedings); Luckey v. Miller, 976 F.2d 673, 674, 677–78 (11th Cir. 1992) (state indigent defense system).

In the present case there are no state criminal, civil, or administrative proceedings underway. Any such proceedings ended when Beaulieu removed her campaign sign from the front of her office. Because there is no risk that a federal injunction would interfere with any pending state proceedings, the district court was not required to abstain from deciding the case.

## VI.

Turning to the merits, the City contends that the district court erred in holding that section 15.2(E)(1) is a content-based restriction on speech that does not survive strict scrutiny. The City argues that the court should have deferred to its construction of the sign ordinance and under that construction, it is a content-neutral time, place, and manner regulation.

We "decide de novo any legal issues relating to the constitutionality of a city ordinance." Joel v. City of Orlando, 232 F.3d 1353, 1357 (11th Cir. 2000). We must construe any ambiguity in the ordinance "in a manner which avoids any constitutional problems." Southlake Prop. Assocs., Ltd. v. City of Morrow, Ga., 112 F.3d 1114, 1119 (11th Cir. 1997). In doing so, we consider the City's "own authoritative construction of the ordinance, including its implementation and interpretation" and defer to that construction "so long as its interpretation is based on a permissible construction." Id.

29

Under the City's construction, the sign ordinance allows political signs to be erected in the B-5 zoning district (the central business district), where Beaulieu's office is located, as long as a permit is first obtained for the signs. It argues that section 15.2(E)(1) does not ban political signs on B-5 property; instead, it exempts political signs from the permit requirement as long as they are posted on residential property. In other words, a person who lives in a residential area anywhere in the city may post a political sign on her property without a permit, but a person who owns an office building in the B-5 zoning district must obtain a permit before posting a political sign on that property.

The City asserts that there are two ways for a property owner or tenant to obtain a permit for a political sign in the B-5 zoning district. First, she may apply for a permit to substitute a political sign for her business sign pursuant to section 12.0, as long as the political sign conforms to "the size, height, area and other requirements of this [o]rdinance." See §§ 8.0(A)(3)(b), 12.0. Second, she may apply for a permit to substitute a political sign for a temporary real estate sign pursuant to sections 12.0 and 15.3(F)(3). See § 15.3(F)(3). The City insists that it would issue a permit for a political sign without regard to the content of the message.

Although the City's construction of section 15.2(E)(1) appears to be at odds with the plain language of that section, we will assume that it is a "permissible construction" for the purpose of analyzing the district court's holding with respect to Beaulieu's facial challenge. See Southlake Prop. Assocs., 112 F.3d at 1119. We proceed in this manner because even construing the ordinance exactly as the City wants, we still conclude that the provisions in question amount to a content-based regulation that cannot survive strict scrutiny.

We begin our evaluation of the constitutionality of the sign ordinance with the analytical framework set out in our prior decisions. See, e.g., Café Erotica of Fla., Inc. v. St. Johns County, 360 F.3d 1274, 1286–87 (11th Cir. 2004). We first ask whether the ordinance is a content-neutral time, place, and manner regulation. Id. at 1286. "In order to be constitutional, a time, place, and manner regulation may not be based upon the content of the regulated speech, must be narrowly tailored to serve a significant government interest, and must leave open ample alternative channels for communication of the information." Id. If we determine that the ordinance discriminates among political messages or discriminates in favor of commercial messages over political ones, it is content-based and we apply strict scrutiny. Id. at 1286–87.

In determining whether the sign ordinance is content-based, we are bound by our decisions in Dimmitt v. City of Clearwater, 985 F.2d 1565 (11th Cir. 1993), and Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250 (11th Cir. 2005). In Dimmitt, we struck down an ordinance that required a property owner to obtain a permit before erecting or altering most signs but that exempted certain types of signs, including flags representing a governmental unit or body. 985 F.2d at 1568. We held that the ordinance was a content-based regulation because the flag exemption applied only to governmental flags. Id. at 1569. We concluded that the regulation did not survive strict scrutiny because the City's asserted interests in aesthetics and traffic were not compelling and did not justify content-based regulation of noncommercial speech. Id. at 1569–70.

More recently in Solantic, we struck down a sign ordinance that exempted from its regulations several types of signs, including government and religious flags. 410 F.3d at 1255–57, 1274. We reasoned that the ordinance was content-based "because some types of signs are extensively regulated while others are exempt from regulation based on the nature of the messages they seek to convey." Id. at 1266. We concluded that the City's interests in aesthetics and traffic safety were not compelling and the ordinance's exemptions were not narrowly tailored to further those interests. Id. at 1267.

The City would have us believe that its sign ordinance is content-neutral because the substitution clause allows "any sign . . . [to] contain, in lieu of any other message or copy, any lawful noncommercial message." See Ordinance 03-010, § 12.0. It urges us to apply National Advertising Co. v. City of Miami, 402 F.3d 1329 (11th Cir. 2005) ("National II"), a companion case to National I, in which we held that National's challenge to Miami's zoning ordinance was rendered moot by the subsequent amendment of the ordinance to include a substitution clause. National II, 402 F.3d at 1330. The clause provided that "[a]ny sign allowed herein may contain, in lieu of any other message or copy, any lawful, non-commercial message, so long as the sign complies with the size and height, area, and other requirements." Id. at 1335. We stated that the amendments "made clear that non-commercial messages would be permitted anywhere commercial messages were allowed" and remedied any constitutional problems with the ordinance. Id.

Although a substitution clause may turn an otherwise content-based regulation into a content-neutral, constitutional one, that is not the case here. Even if political signs can be substituted for real estate signs in the City of Alabaster, they are still not treated equally. Under the City's interpretation of its sign ordinance, a person who wants to post a real estate sign can simply post the sign

33

on her property.  But a person who wants to substitute a campaign sign for a real estate sign under section 12.0 must visit Alabaster City Hall, complete an application for the substitution, pay the permit fee, and wait at least a week for a response.  See Ordinance 03-010, §§ 2.0–2.5, 12.0.

In sum, under the sign ordinance it is easier, cheaper, and faster for Beaulieu to post a real estate sign than a campaign sign.  Because political signs are subject to more regulatory burden than real estate signs, the sign ordinance discriminates against political speech in favor of commercial speech.  See Solantic, 410 F.3d at 1266.  It is a content-based regulation.  See Café Erotica, 360 F.3d at 1286–87.

Like the ordinances in Dimmitt and Solantic, the present sign ordinance cannot survive strict scrutiny.  The City's interests in aesthetics and traffic safety are substantial but they are not compelling for present purposes.  See e.g., Members of the City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 816–17, 104 S. Ct. 2118, 2135 (1984) (aesthetics was a substantial government interest); Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507–08; 101 S. Ct. 2882, 2892 (1981) (plurality opinion) (aesthetics and traffic safety were substantial government interests); Solantic, 410 F.3d at 1267 ("[T]he sign code is not narrowly tailored to accomplish the City's asserted interests in aesthetics and traffic safety, nor has our case law recognized those interests as 'compelling.'");

34

Dimmitt, 985 F.2d at 1570 (aesthetics and traffic safety were not compelling state interests); Don's Porta Signs, Inc. v. City of Clearwater, 829 F.2d 1051, 1053 (11th Cir. 1987) (aesthetics was a substantial government interest); Harnish v. Manatee County, Fla., 783 F.2d 1535, 1539 (11th Cir. 1986) (aesthetics was a substantial government interest); Supersign, 766 F.2d at 1530 (11th Cir. 1985) (aesthetics and traffic regulation were substantial government interests).

Even if the City's interests were compelling, the sign ordinance is not narrowly tailored. The ordinance abstractly recites its interests in aesthetics and traffic safety without explaining how the regulations further those interests generally, or how its discrimination in favor of real estate signs promotes those interests specifically. See Solantic, 410 F.3d at 1267 ("The problem is that the ordinance recites those interests [in aesthetics and traffic safety] only at the highest order of abstraction, without ever explaining how they are served by the sign code's regulations generally, much less by its content-based exemptions from those regulations.").

The sign ordinance's exemption of real estate signs from the permit requirement may further the City's interest in nurturing the real estate market, but it will not make the City of Alabaster shine more brightly or make it a safer place to drive or stroll. See Solantic, 410 F.3d at 1268 ("Simply put, the sign code's

35

exemptions are not narrowly tailored to accomplish either the City's traffic safety or aesthetic goals."); <u>Dimmitt</u>, 985 F.2d at 1570 ("Moreover, these asserted interests [in aesthetics and traffic safety] clearly are not served by the distinction between government and other types of flags; therefore, the regulation is not narrowly drawn to achieve its asserted end.") (internal quotation marks omitted). Because we find that the City's sign ordinance is a content-based regulation that fails strict scrutiny, we need not consider whether the district court erred in holding that the ordinance impermissibly burdened core political speech.

## VII.

The district court's decision is AFFIRMED.