**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CLYDE REED, Pastor; GOOD NEWS
COMMUNITY CHURCH,
          *Plaintiffs-Appellants,*

v.

TOWN OF GILBERT, ARIZONA; ADAM
ADAMS, in his official capacity as
Code Compliance Manager,
          *Defendants-Appellees.*

No. 08-17384

D.C. No.
2:07-cv-00522-SRB

OPINION

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted
April 15, 2009—San Francisco, California

Filed November 20, 2009

Before: Stephen Reinhardt, John T. Noonan and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

**COUNSEL**

Benjamin W. Bull, Jeremy D. Tedesco, Alliance Defense Fund, Scottsdale, Arizona; David A. Cortman (argued), Alliance Defense Fund, Lawrenceville, Georgia; Deborah M. Sheasby, Peter A. Gentala, Center for Arizona Policy, Phoenix, Arizona, for the plaintiffs-appellants.

Robert Grasso, Jr., Kim S. Alvarado (argued), Grasso Law Firm, P.C., Chandler, Arizona, for the defendants-appellees.

**OPINION**

McKEOWN, Circuit Judge:

Although "[i]t is common ground that governments may regulate the physical characteristics of signs," *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994), sign regulations have spawned legions of First Amendment challenges. Those challenges arise because signs "pose distinctive problems that are subject to municipalities' police powers," and yet they are also "a form of expression protected by the Free Speech Clause." *Id.* This case presents yet another variation on a sign ordinance—one that prohibits all signs without a permit, subject to nineteen enumerated exemptions ranging from directional signs to ideological and political signs.

Good News Community Church wishes to spread the word about its Sunday services by placing temporary directional signs around the Town of Gilbert, Arizona. Gilbert, however, limits Good News' deployment of temporary directional signs via the town's comprehensive sign ordinance. Good News

Community Church and its Pastor, Clyde Reed (collectively "Good News"), challenge the ordinance's constitutionality under the First and Fourteenth Amendments, contending it impermissibly burdens the right to free speech and treats similar speech unequally.

Good News appeals the district court's denial of a preliminary injunction barring enforcement of the ordinance. Although we conclude the provision of the ordinance directly regulating Good News' signs does not of itself violate the First Amendment, the district court did not address Good News' claim that the ordinance unfairly discriminates among forms of noncommercial speech. Consequently, we remand for the district court to consider this aspect of Good News' challenge, within the context of the preliminary injunction motion.

## BACKGROUND

### I.   USE OF SIGNS BY GOOD NEWS COMMUNITY CHURCH

Good News does not have a permanent sanctuary, and at the commencement of this litigation had been conducting its Sunday church services at an elementary school in the Town of Gilbert, Arizona ("Gilbert") for about five years.[1] Good News averages 45 regular congregants.

Members of Good News believe the Bible commands them to "go and make disciples of all nations," and that they "should carry out this command by reaching out to the community to meet together on a regular basis." To do so, they "display[ ] signs announcing their services as an invitation for

---

[1]According to the parties, Good News meets currently at a school in the adjacent town of Chandler, Arizona, approximately one mile from the Gilbert town line. The change in location does not moot the controversy, however, because Good News still wishes to place temporary signs in Gilbert due to its proximity to the church's meeting place.

those in the community to attend." Good News states that "[f]or a time, the Church was placing about 17 signs in the areas surrounding the Church," and that the signs "were placed early in the day each Saturday and removed following the services on Sunday mid-day." Good News uses moveable signs that can be placed on or anchored in the ground. The signs vary slightly, but generally contain the name "Good News Community," the phrase "Your Community Church," a website address and phone number, the location and time of the services, and an indicator directing people to the service. Following is an example of one of the signs:



## II. THE SIGN CODE AND ENFORCEMENT AGAINST GOOD NEWS

Like many municipalities, Gilbert regulates the display of outdoor signs. Town of Gilbert Land Development Code, Division 4, General Regulations, Article 4.4, Sign Regulations ("Sign Code" or "Code"). Gilbert's Sign Code prohibits certain types of signs altogether. For signs that are not prohibited, the Code imposes a general ban on displaying signs

without a permit and establishes some generally applicable restrictions. § 4.402(A). Signs that are allowed with permits are regulated according to general categories, for example, "Real Estate."

The Sign Code exempts from the permitting requirement nineteen types of signs.[2] The signs employed by Good News fall under one of the exemptions, § 4.402(P), for Temporary Directional Signs Relating to a Qualifying Event ("Qualifying Event Signs").

In July 2005, Good News received an email from a Gilbert Code Compliance officer noting a violation of an earlier version of § 4.402(P) because Good News' signs had been sited too early and in a public right-of-way. A few months later, a Code Compliance officer issued an advisory notice to Good News, stating that signs were displayed outside of the hours allowed and did not include a date for the religious service.

Good News relates that "[a]fter receiving these citations, the Church reduced the number of signs and the amount of time they placed the signs." In February 2007, the Code Compliance Manager told Good News "that there is no leniency under the Code, and that the Church would be cited if it was determined that it had violated any of the applicable provisions in the Code."

---

[2](1) Signs installed by a governmental jurisdiction; (2) Building Identification Signs; (3) Permanent Regulatory and Parking signs; (4) Information Wall Signs (e.g., "Delivery Entrance"); (5) Real Estate Signs; (6) Residential Open House Signs; (7) Political Signs; (8) Ideological Signs; (9) Garage Sale Signs; (10) Business Identification Banners during street construction; (11) Interim Business Identification Banners; (12) Boutique Signs; (13) Window Signs; (14) A-Frame Signs; (15) Temporary Directional Signs Relating to a Qualifying Event; (16) Construction Signs; (17) Suspended Signs (particular type of commercial sign); (18) Restaurant Menu Signs; and (19) Required Street Addresses. § 4.402(D).

## III. DISTRICT COURT PROCEEDINGS

In March 2008, Good News filed suit in federal court in Arizona, alleging that, on its face and as applied, Sign Code § 4.402(P) violated the Free Speech clause of the First Amendment and the Equal Protection clause of the Fourteenth Amendment. Shortly after filing, Good News moved for a preliminary injunction to stop Gilbert from enforcing § 4.402(P). Gilbert stipulated to a preliminary injunction, as a "sign of good faith," in order for Gilbert to review and amend the original ordinance. The district court granted the stipulated injunction.

In an effort to avoid maintaining a potentially impermissible content-based ordinance, following public hearings the Town Council of Gilbert adopted an amended Sign Code recommended by the Gilbert Planning Commission. Before passage of the amendment, in January 2008, attorneys for the parties conferred, and Good News advised that, in its view, the proposed amendment did not fix § 4.402(P)'s constitutional infirmities.

The amendments left the Sign Code intact except for § 4.402(P) and related sections.[3] The title of § 4.402(P) was

---

[3]The Sign Code was amended in these pertinent ways.

(1) *Title of § 4.402(P)*—changed from "Religious Assembly Temporary Directional Signs" to "Temporary Directional Signs Relating to a Qualifying Event." Other references to the qualifier "Religious Assembly" were replaced with "Relating to a Qualifying Event."

(2) *Size*—changed from 3 feet high to 6 feet, although still not to exceed 6 square feet.

(3) *Number*—retained limit of four per single property; clarified there may be unlimited total.

(4) *Display*—changed from "up to 2 hours before, and 1 hour after the religious service," to "up to 12 hours before, during, and 1 hour after the qualifying event ends."

changed from "Religious Assembly Temporary Directional Signs" to "Temporary Directional Signs Relating to a Qualifying Event." A new definition was added to the glossary for these signs, expanding the coverage of § 4.402(P) to signs related to any events sponsored by non-profit organizations, not just religious gatherings. The restrictions on physical characteristics and use of signs under § 4.402(P) were somewhat modified, although the restriction that Qualifying Event Signs may not be placed in public rights-of-way was retained.

Immediately following adoption of the amended regulation, Good News filed a notice that the amended Sign Code failed to resolve the lawsuit, an amended verified complaint, and a second motion for preliminary injunction.[4] Good News has not been cited under the amended Sign Code, but states that it is not placing signs in the rights-of-way "due to the prohibitions in the amended Code."

(5) *Glossary definition of "Temporary Directional Signs Relating to a Qualifying Event" added*—"A temporary sign intended to direct pedestrians, motorists, and other passersby to a 'Qualifying Event.' A 'Qualifying Event' is any assembly, gathering, activity or meeting sponsored, arranged, or promoted by a religious, charitable, community service, educational, or other similar non-profit organization."

(6) *Glossary definition of "Ideological Sign" amended*—definition amended to read: "a sign communicating a message or ideas for non-commercial purposes that is not a construction sign, directional sign, temporary directional sign relating to a qualifying event, political sign, garage sale sign, or a sign owned or required by a governmental agency."

[4]In addition to the free speech and equal protection claims, Good News also claimed that § 4.402(P) violated the Free Exercise Clause of the First Amendment and Arizona's Religious Freedom Restoration Act (ARFRA), A.R.S. § 41-1493.01. Good News did not seek the preliminary injunction on the basis of these claims, which are not at issue in this appeal.

In September 2008, the district court denied the motion for preliminary injunction. The court concluded that § 4.402(P) is a content-neutral regulation, and that it passes the applicable intermediate level of scrutiny. It further found that the Sign Code does not favor commercial speech over noncommercial speech. Based on its determination that the provision is content-neutral, the court concluded that § 4.402(P) does not violate equal protection, as any uneven effects are an unintended consequence of the lawful content-neutral regulation.

## ANALYSIS

This case comes to us on appeal from the denial of a preliminary injunction. Although we review the denial of a preliminary injunction for abuse of discretion, "we review the legal issues underlying the district court's decision de novo." *Foti v. City of Menlo Park*, 146 F.3d 629, 634-635 (9th Cir. 1998).

The Supreme Court recently summarized the threshold for granting the extraordinary relief of a preliminary injunction: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.* 129 S.Ct. 365, 374 (2008); *see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles,* 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting same). Because the district court concluded that Good News was unlikely to succeed on the merits of its claims, the court did not reach the further inquiries regarding harm, equities and the public interest. Our focus therefore is a legal one—whether the district court erred in its judgment that Good News is unlikely to succeed on the merits because the regulation passes muster under the First and Fourteenth Amendments.

Good News claims that § 4.402(P) violates the First Amendment and the Fourteenth Amendment, both on its face

and as applied to Good News' signs. There are two ways an ordinance may be judged unconstitutional on its face: "[E]ither because it is unconstitutional in every conceivable application, or because it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally 'overbroad.' " *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984). The first type of facial challenge "may be paired with the more common as-applied challenge, where a plaintiff argues that the law is unconstitutional as applied to his own speech or expressive conduct." *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1034 (9th Cir. 2006). Good News opts for this route, claiming that § 4.402(P) would be unconstitutional as applied to any Qualifying Event Sign and that it is also invalid as applied to Good News' signs.

Good News, however, has not demonstrated that its facial challenge to § 4.402(P) warrants separate review. "[W]e have found nothing in the record to indicate that the ordinance will have any different impact on any third parties' interest in free speech than it has on [Good News.]" *Vincent*, 466 U.S. at 801. "[Good News'] attack on the ordinance is basically a challenge to the ordinance as applied to [its] activities. We therefore limit our analysis of the constitutionality of the ordinance to the concrete case before us . . . ," whether § 4.402(P) is unconstitutional as applied to Good News. *Id.* at 803.

## I.  CONSTITUTIONALITY OF QUALIFYING EVENT REGULATION

We begin with the simple proposition that Gilbert's sign regulation is subject to First Amendment scrutiny. In an effort to promote a safe, harmonious and pleasant environment—and presumably to insulate itself from challenges under the First Amendment—Gilbert has adopted a sign ordinance that makes one's head spin to figure out the bounds of its restrictions and exemptions. Our initial focus is on § 4.402(P), the exemption that regulates Qualifying Event Signs.

## A.   CONTENT-BASED REGULATIONS

**[1]** The first question is whether § 4.402(P) is a regulation based on the content of speech. *See Ladue*, 512 U.S. at 59 (O'Connor, J., concurring) ("The normal inquiry that our doctrine dictates is, first, to determine whether a regulation is content based or content neutral, and then, based on the answer to that question, to apply the proper level of scrutiny."). "A regulation is content-based if either the underlying purpose of the regulation is to suppress particular ideas or, if the regulation, by its very terms, singles out particular content for differential treatment." *Berger. v City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (internal citations omitted). Exemptions to otherwise permissible regulations must nonetheless be scrutinized as "an exemption . . . may represent a governmental attempt to give one side of a debatable public question an advantage in expressing its views to the people." *Ladue*, 512 U.S. at 51 (internal quotation omitted).

According to the Purposes section of the ordinance, the Sign Code was adopted to assure "proper and efficient expression through visual communication" that is "compatible with the character and environment" of Gilbert; to eliminate confusing, distracting and unsafe signs; and to enhance the aesthetic environment of the town. § 4.401. Nothing in the regulation suggests any intention by Gilbert to suppress certain ideas through the Sign Code, nor does Good News claim that Gilbert had any illicit motive in adopting the ordinance. Gilbert asserts that the exemptions to the Sign Code were included to accommodate the speech interests of various members of the Gilbert community, and that, in particular, § 4.402(P) is intended to provide groups such as Good News the opportunity to spread the word about their events without the restriction of a permitting process. Gilbert's unimpeached intentions, however, do not satisfy our inquiry. *See Foti*, 146 F.3d at 636 n.7 ("Although Menlo Park's exemptions for open house signs and safety, traffic, and informational signs seem innocuous, we base our content-based determination on

whether the ordinance singles out certain speech for differential treatment based on the idea expressed. The reasonableness, harmlessness, or worthiness of the idea is irrelevant.").

**[2]** "[W]hether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based." *Menotti v. City of Seattle*, 409 F.3d 1113, 1129 (9th Cir. 2005) (quoting *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 448 (2002) (Kennedy, J., concurring)) (internal quotation marks omitted). This succinct summation of the law does not address what is meant by "content." We look to two Ninth Circuit cases that are helpful in giving texture and meaning to the term when applied to a sign ordinance.

In *Foti v. City of Menlo Park*, the sign ordinance placed a general ban on posting signs on public property or displaying signs in public rights-of-way. 146 F.3d at 633-34. But the Menlo Park code included exemptions for temporary "open house" real estate signs; signs placed by government entities; safety, traffic, and public informational signs; certain signs on cars; and pickets. *Id.* Picketers, such as the plaintiffs, who wanted to protest outside of a family planning clinic, were limited to carrying one sign under three square feet, and had to move while carrying the sign. *Id.*

We concluded that the "exemptions [in the Menlo Park ordinance] for 'open house' real estate signs and safety, traffic, and public informational signs are content-based. To enforce the ordinance, a law enforcement officer must 'examine the content of . . . signs to determine whether the exemption applies.' " *Foti,* 146 F.3d at 636 (quoting *Desert Outdoor Advert. v. City of Moreno Valley*, 103 F.3d 814, 820 (9th Cir. 1996)). Good News points to *Foti* as the controlling case.

Gilbert argues that instead of drawing support from *Foti*, we should look to *G.K. Limited Travel v. City of Lake Oswego*, 436 F.3d 1064 (9th Cir. 2006). In *G.K. Limited,* the

city of Lake Oswego, Oregon, passed a sign ordinance that banned the erection of new signs on poles and required taking down existing pole signs,[5] either when the "copy" on the sign changed or by a general deadline set by the ordinance. 436 F.3d at 1069. G.K. Limited, a travel agency, purchased another agency that owned a pole sign. G.K. Limited wanted to change the copy of the pole sign by substituting its name, and objected to the requirement that it remove the sign to comply with the Lake Oswego code. We concluded that the grandfather provision of the ordinance was content neutral, and sounded a caution:

> Plaintiffs attempt to broaden *Foti* to stand for the proposition that any time an ordinance requires a law enforcement officer to read a sign, the ordinance must be content based. We reject such an expansive reading. The *Foti* test actually turns on 'whether the ordinance singles out certain speech for differential treatment based on the idea expressed;' enforcement officials having to read a sign is persuasive evidence of such a purpose but may not always be dispositive.

*G.K. Ltd.*, 436 F.3d at 1078 (quoting *Foti*, 136 F.3d at 636).

We went on to explain the rationale underlying *Foti*:

> In *Foti,* we evaluated a Menlo Park ordinance banning all signs on all public property. The law, however, exempted "open house," safety, traffic and public information signs. Relying on our earlier ruling in *Desert Outdoor Advertising v. City of Moreno Valley,* 103 F.3d 814, 820 (9th Cir. 1996), we concluded that these exemptions were content based "because a law enforcement officer must read a sign's message to determine if the sign is exempted

---

[5]Pole signs are free-standing signs that stand more than a few feet above the ground.

from the ordinance." *Foti,* 146 F.3d at 636. Menlo Park was clearly expressing a preference for certain types of signs by exempting them from the city's general prohibition. The only way to determine if a sign was the type qualified to receive Menlo Park's favorable treatment was to evaluate the content and substantive message of the sign.

*Id.*

We then noted that:

Neither the speaker- nor event-based exemptions implicate *Foti* insofar as neither requires law enforcement officers to "read a sign's message to determine if the sign is exempted from the ordinance." *Foti*, 146 F.3d at 636. In the speaker category, officers decide whether an exemption applies by identifying the entity speaking through the sign without regard for the actual substance of the message. In the case of event-based exemptions . . . the officer must determine only whether a specific triggering event has occurred and if the temporary sign has been erected within the specified time frame.

*Id.*

[3] Taking these two cases together, we learn that our focus should be on determining whether the ordinance targets certain content; whether the ordinance or exemption is based on identification of a speaker or event instead of on content; and whether an enforcement officer would need to distinguish content to determine applicability of the ordinance.

### B. CONTENT-BASED ANALYSIS REGARDING QUALIFYING EVENT REGULATION

With these principles in mind, we turn to § 4.402(P), the Qualifying Event provision. Following amendment of the Sign Code, § 4.402(P) reads:

***Temporary Directional Signs Relating to a Qualifying Event.*** Temporary Directional Signs Relating to a Qualifying Event shall be permitted subject to the following regulations:

1. *Size*. Signs shall be no greater than 6 feet in height and 6 square feet in area.

2. *Number*. No more than 4 signs shall be displayed on a single property at any time.

3. *Display*. Signs shall only be displayed up to 12 hours before, during, and 1 hour after the Qualifying Event ends. The person who installed the signs shall be responsible for removal. If the person installing the signs is unknown, the property owner shall be responsible.

4. *Location*. Temporary Directional Signs Relating to a Qualifying Event may be located off-site and shall be placed at grade level. Signs shall be placed only with the permission of the owner of the property on which they are placed.

5. *Prohibited Locations*. Temporary Directional Signs Relating to a Qualifying Event shall not be located:

   a. In the public right-of-way.

   b. On fences, boulders, planters, other signs, vehicles, utility facilities, or any structure.

6. *Construction*. Signs shall be:

   a. Constructed of durable and weather-resistant materials.

    b.   Anchored or weighted down to avoid being displaced in windy conditions, or otherwise to be a safety hazard to the public.

**[4]** Section 4.402(P) regulates physical characteristics, such as size, number and construction of the signs; location of placement; and timing of display. None of these restrictions implicate the content of speech. The only possible content-based aspect of § 4.402(P) is its limitation to signs related to "Qualifying Events." In the Glossary of the amended Code, Temporary Directional Signs Relating to a Qualifying Event are defined as temporary signs intended to direct passersby to a "Qualifying Event," which, in turn, means:

> any assembly, gathering, activity, or meeting sponsored, arranged or promoted by a religious, charitable, community service, educational or other similar non-profit organization.

A directional sign does not contain a message such that regulating directional signs would inherently "distinguish favored speech from disfavored speech on the basis of the ideas or views expressed." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 643 (1994). The definition of Qualifying Event Signs bears out this observation, as it does not mention any idea or viewpoint, let alone single one out for differential treatment.

**[5]** The definition of a Qualifying Event sign merely encompasses the elements of "who" is speaking and "what event" is occurring. These two criteria invoke the speaker-based and event-based characteristics approved in *G.K. Limited* because "the City d[id] not limit the substance of [the] speech in any way." 436 F.3d at 1078. In addition to the pole sign ban, the plaintiffs in *G.K. Limited* challenged exemptions in the Lake Oswego sign ordinance. *Id.* at 1070. We concluded the exemptions from the permitting and fee require-

ments for "public signs, signs for hospital or emergency services, legal notices, railroad signs and danger signs" were speaker-based exemptions that did not relate to the contents of the signs. *Id.* at 1076-77. We reached that conclusion because "officers decide whether an exemption applies by identifying the entity speaking through the sign without regard for the actual substance of the message." *Id* at 1078. Here, an officer can likewise determine whether a "religious, charitable, community service, educational or other similar non-profit organization" is "speaking through the sign" without assessing the substance of the sign's contents.

The plaintiffs in *G.K. Limited* also contested the permit exemption for "temporary signs in residential zones." *Id* at 1070. This exemption allowed homeowners to erect a temporary sign regarding any subject when a triggering event, such as a home sale or election, occurred. We characterized the provision as an event-based exemption that, again, did not relate to the content of the speech. *Id.* at 1078. "In the case of event-based exemptions to the permitting process, the officer must determine only whether a specific triggering event has occurred and if the temporary sign has been erected within the specified time frame." *Id.* Similarly, for a Qualifying Event Sign, in addition to the content-neutral step of noting the speaker, the Gilbert officer need only check that an event is listed on the sign and the timing of the event. Identifying a triggering event under § 4.402(P) does not entail making a content-based determination. "We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct." *Hill v. Colorado*, 530 U.S. 703, 721 (2000) (holding that need for officers to sometimes review the contents of oral statements made by "sidewalk counselors" to determine whether ordinance limiting speech near health care facilities was violated did not make ordinance content based).

Good News contends that because a Gilbert enforcement officer must review elements of Good News' signs in order to

apply § 4.402(P) the section is content based. Surely, however, this regulation is a good example that the "officer must read it" test is not always determinative of whether a regulation is content based or content neutral. The district court indeed recognized that we have "not applied the 'officer must read it test' so strictly that a law must be invalidated any time it forces an officer's eyes to venture within the four corners of the sign." *See Berger*, 569 F.3d 1052 n. 22 ("Whether an officer must read a message is persuasive evidence of an impermissible content-based purpose, but is not dispositive.") (quoting *Ctr. for Bio-Ethical Reform v. Los Angeles Cty. Sheriff Dep't,* 533 F.3d 780, 789 n. 5) (9th Cir. 2008) (internal quotation marks omitted); *see also ACLU of Nevada v. City of Las Vegas*, 466 F.3d 784, 796 n.12 (9th Cir. 2006) (observing same).

[6] This case also highlights the absurdity of construing the "officer must read it" test as a bellwether of content. If applied without common sense, this principle would mean that every sign, except a blank sign, would be content based. While a Gilbert officer needs to briefly take in what is written on the Qualifying Event Sign to note who is speaking and the timing of the listed event, this "kind of cursory examination" is not akin to an officer synthesizing the expressive content of the sign. *Hill*, 530 U.S. at 721. *See G.K. Ltd.*, 436 F.3d at 1079 (observing that the pole sign grandfather clause "does not require Lake Oswego officials to evaluate the substantive message on the preexisting sign and the clause certainly does not favor speech 'based on the idea expressed' "); *see also, e.g., Covenant Media of South Carolina v. City of North Charleston*, 493 F.3d 421, 434 (4th Cir. 2007) (holding that to the extent enforcement of a sign ordinance similar to Gilbert's that "defined and distinguished between different types of signs," including "directional or instructional signs," required "looking generally at what type of message a sign carries to determine where it can be located, this 'kind of cursory examination' did not make the regulation content based") (quoting *Hill*, 530 U.S. at 721); *La Tour v. City of Fayette-*

*ville, Arkansas*, 442 F.3d 1094, 1096 (8th Cir. 2006) (noting that an exception to a sign ordinance's ban on electronic message signs for "time and temperature" signs was distinguishable from a provision in a prior case regulating political signs, as "[i]t takes some analysis to determine if a sign is 'political,' but one can tell at a glance whether a sign is displaying the time or temperature"). We conclude that § 4.402(P) is not a content-based regulation: It does not single out certain content for differential treatment, and in enforcing the provision an officer must merely note the content-neutral elements of who is speaking through the sign and whether and when an event is occurring.

## C. TIME, PLACE, MANNER RESTRICTIONS

**[7]** Resolution of content neutrality does not end our inquiry. The sign restriction, as a content-neutral time, place and manner regulation, must also be "narrowly tailored to serve a significant governmental interest, and [must] leave open ample alternative channels for communication of that information.' " *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989) (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).[6]

### 1. Narrow tailoring

We have explained that narrow tailoring to serve a significant governmental interest

> requires that the regulation actually advance the government's interest, but it need not do so in the least restrictive or least intrusive way. "So long as the

---

[6]In *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002), the Supreme Court recognized that content-neutral time, place and manner regulations must "contain adequate standards to guide the official's decision and render it subject to effective judicial review." Good News has not claimed that the Sign Code lacks adequate standards for enforcement.

means chosen are not substantially broader than nec-
essary to achieve the government's interest . . . the
regulation will not be invalid simply because a court
concludes that the government's interest could be
adequately served by some less speech-restrictive
alternative."

*G.K. Ltd.*, 436 F.3d at 1073-74 (quoting *State Univ. of New
York v. Fox,* 492 U.S. 469, 479 (1989) (internal citation omit-
ted)). *See also Hill*, 530 U.S. at 726 (emphasizing that "when
a content-neutral regulation does not entirely foreclose any
means of communication, it may satisfy the tailoring require-
ment even though it is not the least restrictive or least intru-
sive means of serving the statutory goal").

**[8]** Gilbert identifies two interests motivating § 4.402(P):
aesthetics and traffic and pedestrian safety. Beauty and safety
are familiar players in the free speech skirmishes involving
sign ordinances. *See Foti*, 146 F.3d at 637 ("The City's
asserted interests in the ordinance are the oft-invoked and
well-worn interests of preventing visual blight and promoting
traffic and pedestrian safety."). These purposes are readily
recognized as significant governmental interests. *See
Metromedia v. City of San Diego*, 453 U.S. 490, 507-508
(1981) ("Nor can there be substantial doubt that the twin goals
that the ordinance seeks to further—traffic safety and the
appearance of the city—are substantial governmental goals.");
*One World One Family Now v. City and County of Honolulu*,
76 F.3d 1009, 1013 (9th Cir. 1996) ("Cities have a substantial
interest in protecting the aesthetic appearance of their commu-
nities by 'avoiding visual clutter' . . . [and] assuring safe and
convenient circulation on their streets.") (quoting *Vincent*,
466 U.S. at 806-07). Gilbert's identification in the Code of the
recognized interests in safety and aesthetics "is all our review
requires to prove a significant interest." *Get Outdoors II v.
City of San Diego*, 506 F.3d 886, 893-94 (9th Cir. 2007).

**[9]** In assessing § 4.402(P)'s tailoring, the district court
credited Gilbert's contention that "it ha[d] taken steps to

ensure that Plaintiffs' speech is not overly restricted." The restrictions on time, place and manner imposed by Gilbert on the display of Qualifying Events Signs would indeed appear to "actually advance" the aesthetic and safety interests by limiting the size, duration and proliferation of signs. *See G.K. Ltd.*, 436 F.3d at 1073. These measures restricting the number of signs and limiting them to private property do not appear substantially broader measures than required to make sure the rights-of-way are not so thicketed with signs as to pose a safety hazard or create an aesthetic blight. The limitation on timing—twelve hours before the event and one hour after—is equally narrowly tailored to meet these interests. While it might be easier and provide broader exposure for Good News to have the sign up for twenty-four hours, the test is not convenience or optimal display. *See Hill*, 530 U.S. at 727 (noting when reviewing a Colorado ordinance limiting "sidewalk counseling" that "whether or not the 8-foot interval is the best possible accommodation of the competing interests at stake, we must accord a measure of deference to the judgment of the Colorado legislature.") The district court did not abuse its discretion in concluding § 4.402(P) is narrowly tailored, as it "does not sweep in more speech than is necessary to achieve the Town's aesthetic and traffic control objectives."

## 2. Ample alternative channels for communication

Good News contends that § 4.402(P) leaves it without adequate channels to communicate its message inviting passersby to attend church services. The district court found that "Plaintiffs' alternative channels of communication include distributing leaflets, sending email messages or mail advertisements, walking the sidewalks with signs advertising the church services, posting signs carrying religious messages on their own property, and advertising in the newspaper, phonebook or other print media."

[10] On appeal, Good News responds that displaying Qualifying Event Signs is the most effective way of communicat-

ing its invitation, and claims that when it placed more signs it attracted more congregants. Again, the test is not whether another option would be more optimal for Good News: "[W]e are cautioned against invalidating government regulations for failing to leave open ample alternative channels unless the regulations foreclose[s] 'an entire medium of public expression across the landscape of a particular community or setting.' " *G.K. Ltd.*, 436 F.3d at 1074 (quoting *Colacurcio v. City of Kent*, 163 F.3d 545, 555 (9th Cir. 1998).[7] While the alternative options identified by the district court may not be Good News' preference, "we cannot invalidate the Sign Code merely because it restricts plaintiffs' preferred method of communication." *G.K. Ltd.*, 436 F.3d at 1074. Nor do the alternative modes available appear especially burdensome. The district court did not abuse its discretion by finding that the "alternative channels of communication [it listed] ensure that Plaintiffs are able to 'communicate effectively' with members of the public."

[11] Section 4.402(P) is a content-neutral regulation of the time, place and manner of display of Good News' Qualifying Event Signs; the provision is narrowly tailored to further Gilbert's significant interests in aesthetics and traffic safety; and Good News has ample alternative channels of communicating its invitation to church services. The district court did not err in concluding that Good News was unlikely to succeed in demonstrating § 4.402(P) is unconstitutional because it is a content-based regulation that does not survive strict scrutiny.

---

[7]*Ladue* provides a worthwhile contrast. The City of Ladue banned homeowners from displaying signs on their properties, except for certain identification and for sale signs. 512 U.S. at 45. The Supreme Court concluded that displaying a sign at one's home endows the sign with special meaning, and that "[i]n this case, we are not persuaded that adequate substitutes exist for the important medium of speech that Ladue has closed off." *Id.* at 56 (internal citation omitted). Here, Gilbert has not foreclosed the entire medium of temporary signs, and has left open a number of reasonable substitutes for Good News to communicate its message.

## II. SIGN CODE'S TREATMENT OF COMMERCIAL SPEECH VERSUS NONCOMMERCIAL SPEECH

[12] Municipalities stray beyond the boundaries of acceptable time, place and manner regulation when an ordinance favors commercial forms of speech over noncommercial speech. *In Metromedia*, the Supreme Court tackled this issue in the context of San Diego's billboard ordinance, which permitted on-site commercial advertising, but forbade off-site commercial billboards and all noncommercial billboards. 453 U.S. at 495-96 (plurality opinion). The Court invalidated the ordinance, emphasizing that San Diego's priorities were topsy-turvy, as "our recent commercial speech cases have consistently accorded noncommercial speech a greater degree of protection than commercial speech." *Id.* at 513. In *National Advertising v. City of Orange*, 861 F.2d 246 (9th Cir. 1988), we echoed the lesson from *Metromedia*: "Merely treating noncommercial and commercial speech equally is not constitutionally sufficient. The First Amendment affords greater protection to noncommercial than to commercial expression. Regulations valid as to commercial speech may be unconstitutional as to noncommercial." *Id.* at 248 (internal citations omitted).[8]

[13] Good News argues that the Sign Code advantages commercial speech over the noncommercial speech found in Qualifying Event Signs. The district court concluded, however, that Good News' "noncommercial speech enjoys fewer restrictions than its commercial counterparts." The court performed a careful comparison of the restrictions placed on

---

[8]*See also Berger*, 569 F.3d at 1055 (holding invalid an ordinance that restricts speech within 30 feet of a "captive audience" in a public park, but excepts concessionaires: "First, the rule's preference for concessionaires and licensees leads to the odd result that purely commercial speech, which receives more limited First Amendment protection than noncommercial speech, is allowed and encouraged, while artistic and political speech is not. This bias in favor of commercial speech is, on its own, cause for the rule's invalidation.").

Qualifying Event Signs versus "Weekend Directional Signs" for subdivision sales, the commercial speech showcased by Good News as receiving more favorable treatment.[9] The district court concluded that Qualifying Event Signs come out on top as the total number of Qualifying Event Signs allowed is greater; Qualifying Event Signs may be placed during weekdays as well as weekends; the size allowed for Qualifying Events Signs is greater; and although the Qualifying Events Signs may not be placed in rights-of-way, they are not restricted to a two-mile radius from the event. Of "paramount importance" to the court was the fact that no permit is required to display a Qualifying Events Sign, in contrast to the permit required for the Weekend Directional Signs. The district court did not abuse its discretion in concluding, after close examination, that the Sign Code does not favor commercial speech over non-commercial speech, and denying a preliminary injunction on that basis. *Cf. Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1233 (11th Cir. 2006) (invalidating sign ordinance that made it "easier, cheaper, and faster for [the plaintiff] to post a real estate sign than a campaign sign," and thereby discriminated against noncommercial speech in favor of commercial speech).

## III.   SIGN CODE'S TREATMENT OF DIFFERENT FORMS OF NONCOMMERCIAL SPEECH

[14] Not only must a municipality refrain from favoring commercial over noncommercial speech, it also may not favor certain noncommercial speech over other noncommercial speech without facing stricter review. In *Metromedia*, the

---

[9] A Weekend Directional Sign is a "temporary off-site sign directing motorists to a developing subdivision." § 4.405(B)(2). According to the Code, fifteen Weekend Directional Signs may be permitted to each subdivision plat, and the signs may be placed within two miles of the subdivision perimeter, including in public rights-of-way. The signs may be no greater than four feet high and three feet square; they may be installed after 6:00 p.m. on Friday and must be removed by 8:00 a.m. the following Monday. *Id.*

Supreme Court warned against such an approach: "Although the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests." 453 U.S. at 514.

We heeded *Metromedia*'s warning in *National Advertising Co. v. City of Orange*. The City of Orange imposed a general ban on offsite signs, with exceptions for "certain governmental signs and flags, memorial tablets, recreational signs, and temporary political, real estate, construction, and advertising signs." 861 F.2d at 247. We concluded that, through its exemptions, Orange made content-based distinctions among categories of noncommercial speech, and invalidated the ordinance as to noncommercial speech. *Id.* at 250. *Compare Nat'l Advert. Co. v. Town of Babylon*, 900 F.2d 551, 557 (2d Cir. 1990) (holding that sign ordinance's exceptions to sign ban for temporary political signs and signs identifying parades, festivals, and other similar occasions "impermissibly discriminate between types of noncommercial speech based on content") *with Messer v. City of Douglasville, Georgia*, 975 F.2d 1505, 1513 (11th Cir. 1992) (holding exemptions in sign code from permitting requirement are not unconstitutional and noting they are more limited than the exemptions in *Metromedia* or *City of Orange*; do not "express a preference between noncommercial messages;" and do not include "specific exemptions for political, historical, religious or special event signs").

Good News argues that the Sign Code makes distinctions between Qualifying Event Signs and other forms of noncommercial speech, thereby impermissibly favoring some noncommercial speech. A preliminary review of the nineteen exemptions to the permit requirement reveals several categories related to noncommercial speech. For example, an "Ideological Sign" is defined as "[a] sign communicating a message or ideas for non-commercial purposes that is not a construction sign, directional sign, temporary directional sign

relating to a qualifying event, political sign, garage sale sign, or a sign owned or required by a governmental agency." § 4.402(J). In other words, an Ideological Sign includes a message or idea that is distinct from a Political Sign that supports a candidate or ballot measure or from a Qualifying Event Sign.

**[15]** Although Ideological Signs, Political Signs, and Qualifying Event Signs are all exempted from the Sign Code's permit requirement, and treated favorably under the Code in that respect, each category faces different restrictions and requirements. The district court carefully analyzed the other First Amendment challenges, but did not address whether Good News is likely to succeed on the merits of its claim that § 4.402(P) impermissibly discriminates among certain forms of noncommercial speech. On remand, the district court will have the opportunity to determine whether Gilbert impermissibly "evaluate[d] the strength of, or distinguished between, various [noncommercial] communicative interests." *Metromedia*, 453 U.S. at 514.

## CONCLUSION

Because § 4.402(P) is a content-neutral regulation that passes muster and because it does not impermissibly favor commercial speech over noncommercial speech, we affirm the denial of a preliminary injunction on those First Amendment and Equal Protection claims. We remand for the district court to consider the First Amendment and Equal Protection claims that the Sign Code is unconstitutional in favoring some noncommercial speech over other noncommercial speech.

**AFFIRMED in part, REMANDED in part.** Each party shall bear its own costs on appeal.