TALLMAN, Circuit Judge,
dissenting:
It has been said that the life of a canary in a coal mine can be described in three words: short but meaningful. So, too, apparently was the life of our decision in Lands Council v. McNair, 587 F.3d 981 (9th Cir.2008) (en banc).
With respect to my distinguished colleagues, the holding today undermines a congressionally authorized land exchange that, until now, has been approved at ev *651 ery stage of its fifteen-year history. The court’s opinion is based on a fundamentally flawed reading of selective portions of a comprehensive record. The opinion then culminates in a novel and unworkable legal standard that not only effectively precludes these beneficial land exchanges between the federal government and private or public landowners, but also impairs the Bureau of Land Management’s (“BLM”) ability to effectively manage the public lands in a manner that furthers the public interest. Finally, the opinion gives no credence to the ability of the State of Arizona to manage lands under its regulatory jurisdiction, nor consideration to the substantial federal and state environmental, mining, and land use laws that will nonetheless be applicable whether or not the land exchange is approved.
In Lands Council, our en banc court confirmed the proper level of deference owed to agency determinations made within the agency’s area of expertise. Nevertheless, my colleagues disregard that precedent and once again endeavor to impermissibly expand the scope of judicial oversight and scrutiny of agency action. Today’s opinion is irreconcilable with Lands Council, which sought to rein in this type of judicial second-guessing in highly specialized areas.
I
Though my colleagues, in their new amended opinion, disclaim any effort to determine how the Mining Law of 1872 (the “Mining Law”), 30 U.S.C. § 21 et seq., might apply should the land transfer proceed, this case turns on the unique history of nearly 140 years of federal encouragement of mining on public lands. That seminal statute cannot be disregarded in deciding whether the agency decision can withstand judicial scrutiny. Congressional intent to benefit the country and insure its economic prosperity are completely ignored by the majority in its attempt to inject its views on how these lands should be administered. The revised opinion disingenuously removes the old opinion’s “super-Mining Plan of Operations” (“MPO”)[1] requirement, see Ctr. for Biological Diversity v. U.S. Dep’t of the Interior, 581 F.3d 1063, 1074 (9th Cir.2009), and now simply declares that the BLM’s comparison between the land exchange and no-action alternatives was insufficient. But this requirement for some undefined additional comparison is just the previous judicially declared quasi-MPO requirement in disguise.
The underlying environmental challenge in this case seeks to overturn the approval of a mutually beneficial land exchange involving federal and non-federal parcels in southern Arizona (the “Land Exchange”) between the BLM, an agency within the U.S. Department of the Interior, and Asarco LLC (“Asareo”), a private mining company that already possesses significant mining rights on the public land to be traded. The Mining Law establishes Asarco’s existing mining rights to the selected lands whether owned in fee simple or not.[2] The Federal Land Policy and Man *652 agement Act (“FLPMA”), 43 U.S.C. § 1701 et seq., governs the management of federal lands and sets congressional policy authorizing the agency to enter into land exchanges with public or private landowners. The National Environmental Policy Act (“NEPA”), 42 U.S.C. § 4321 et seq., is a procedural mechanism for assessing their environmental impact, which the BLM must consider in determining whether to approve a land exchange under FLPMA.
By beginning its analysis and focusing almost exclusively on NEPA, then working backward to discuss FLPMA only tangentially, while omitting the Mining Law entirely, the court’s opinion inverts the legal analysis, reaches the wrong result, and, in doing so, creates bad law. With a single exception, the majority does not contest the thoroughness of the Environmental Impact Study (“EIS” or “FEIS”) prepared in accordance with NEPA or the sound reasoning of the BLM’s Record of Decision (“ROD”) approving the Land Exchange. In my colleagues’ minds, however, that single exception forms the linchpin of the NEPA and FLPMA analyses, and is alone sufficient to undermine a complicated agency decision and to grant the request by Appellants Center for Biological Diversity, Western Land Exchange Project, and Sierra Club (collectively, “CBD”) to block the exchange.
The court’s opinion makes a series of fundamental missteps. First, the majority appears to believe that “Asarco has spent sixteen years, and considerable amounts of time and money, seeking to achieve private ownership of the exchanged land” merely so that it can “avoid having to prepare the MPOs that are required so long as the land remains in public hands.” Amend. Maj. Op. at 636. That unfounded assumption totally misapprehends why both private and government landowners engage in congressionally authorized land exchanges. It also misapprehends our role as judges, which is to examine a government agency’s decision to determine whether it is arbitrary and capricious, not to prognosticate on suspected ulterior motives of non-governmental participants in federal land exchanges.
Second, the opinion adopts a misguided view of the record — one pressed by CBD’s briefing — that, for the purposes of considering the environmental impacts of the Land Exchange, the BLM blindly assumed that the type, scope, and intensity of Asarco’s mining and mining-related activities on the selected lands would be exactly the same whether or not the Land Exchange occurred. Id. at 639. The majority then concludes — an apparent finding of fact for the first time on appeal — that “both Asarco and the BLM have a fairly detailed knowledge of what Asarco intends to do if the proposed exchange is approved,” but the BLM has wrongfully chosen not to require an MPO incorporating that knowledge into its analysis of the Land Exchange. Id. at 645-46.
Building upon the shaky foundation of these two highly questionable appellate assumptions, the majority, without identifying supporting authority, construes NEPA beyond its proper bounds to erect a procedural hurdle henceforth applicable to the land exchange approval process: Whenever a landowner proposes an exchange for public land on which it already holds mining rights, NEPA requires that the landowner effectively exercise those mining rights by engaging in some type of not *653 quite “full-fledged” MPO environmental consequence comparison process. Id. at 645-46.
The court does not specify exactly what would need to be done to meet the requirements of NEPA under these circumstances. It insists that there is no need for Asarco to “file full-fledged MPOs for the mining it will conduct on the selected lands,” but states that the BLM must compare “the environmental consequences of Asarco’s likely mining operations with and without the requirement that MPOs be prepared by Asarco and approved by the BLM.” Id. But that is exactly what the BLM already did in this case. By amending its original opinion to remove the express requirement that Asarco file an MPO before the BLM may approve the sale, the majority is simply attempting to mask its creation of a new substantive rule. The majority’s insistence that this is not a new rule does not make the effect of this ruling any less real.
Notwithstanding the standards set by Congress and our recent decision in Lands Council, my colleagues are attempting to judicially legislate, ostensibly through NEPA, an additional procedural requirement that necessarily imposes considerable substantive burdens on the parties. We were reversed by the Supreme Court in Weinberger v. Catholic Action of Hawaii/Peace Education Project, 454 U.S. 139, 102 S.Ct. 197, 70 L.Ed.2d 298 (1981),[3] when we read NEPA to require the Navy to prepare a hypothetical EIS based on assumptions regarding the operations of a facility capable of storing nuclear weapons. Id. at 145, 102 S.Ct. 197 (explaining that the “Court of Appeals in this case should have accepted the balance struck by Congress, rather than engrafting onto the statutory language unique concepts of its own making”). My colleagues repeat this error here. It would not fool the canary.
To add a final overburden to the new procedure, the court eschews any attempt to opine whether the Land Exchange, even if it complied with the majority’s new “quasi-MPO” requirement, would violate the Mining Law of 1872. This guarantees yet another round of expensive appeals, delaying for many more years the completion of the Land Exchange.
Applying this novel, judicially-created NEPA requirement to its interpretation of the record, the majority, with a few strokes of the pen, invalidates a Land Exchange that the BLM determined was in the public’s best interest following careful and comprehensive evaluation. My colleagues reject without comment the sound reasoning of the BLM Arizona State Director, the Interior Board of Land Appeals (“IBLA”), and the district court — all of whom considered and rejected the same legal challenges presented by CBD — and conclude that the agency failed to take a “hard look” at the potential environmental consequences of the proposed action in violation of NEPA. For the same reason, they also summarily reject as arbitrary and capricious the BLM’s “public interest” determination pursuant to FLPMA — a determination based almost exclusively on other considerations.
I strongly disagree with this conclusion as well as with my colleagues’ methodology in crafting the result. We should reject the arguments presented by CBD, and affirm the district court’s order of summary judgment in favor of Asarco and the BLM, because the BLM reasonably concluded that the Land Exchange is in the best interests of the public.
*654 II
FLPMA sets forth the principles governing the management of lands owned by the United States and administered by the Secretary of the Interior through the BLM. The congressionally delegated authority is broad. Section 206 of FLPMA authorizes the BLM to exchange certain public lands for state, county, or private lands within the same state when it determines that “the public interest will be well served by making that exchange.” 43 U.S.C. § 1716(a). That is, “giv[ing] full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife[,]” the BLM determines whether “the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Federal lands or interests and the public objectives they could serve if acquired.” Id. Environmental impact is certainly a factor, and unquestionably an important one, in the BLM’s “public interest” determination under FLPMA. NEPA establishes the procedures by which agencies must consider the environmental impacts of agency action, but does not dictate substantive results. See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350-51, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).
Public land exchanges frequently benefit everyone involved in the transfer — the federal government, the exchanging public or private property owner, and, most importantly, the public at large. Exchanges are typically employed, as is proposed here, to eliminate patchwork ownership of isolated parcels. Once consolidated, such lands can be managed efficiently, effectively, and economically for all sorts of beneficial uses — creation of parklands, wilderness areas, hiking and biking trails, environmental remediation and protection, or improved stewardship of multiple-use lands and forests. It is undisputed that the Land Exchange at issue would serve these very purposes, among others.[4]
What is unusual about these particular types of land swaps is the overlay of congressionally authorized mineral exploration and extraction rights in federal lands to which the miner — in this case, Asarco— needs no title. Asarco’s preexisting mining rights under the Mining Law therefore lie at the core of this agency action.
The Mining Law states that “all valuable mineral deposits in lands belonging to the United States ... shall be free and open to exploration,” 30 U.S.C. § 22, and, stated generally, authorizes and governs prospecting and mining for economic minerals on federal public lands. It was designed to encourage individuals to “prospect, explore and develop the mineral resources of the public domain through an assurance of ultimate private ownership of the minerals and the lands so developed.” United *655 States v. Curtis-Nev. Mines, Inc., 611 F.2d 1277, 1281 (9th Cir.1980); accord United States v. Shumway, 199 F.3d 1093, 1098-99 (9th Cir.1999) (“The miners’ custom, that the finder of valuable minerals on government land is entitled to exclusive possession of the land for purposes of mining and to all the minerals he extracts, has been a powerful engine driving exploration and extraction of valuable minerals.... ”).[5]
Under the Mining Law, all citizens have the right to enter public lands open to mineral entry and locate mining claims or mill site claims. Independence Mining Co. v. Babbitt, 105 F.3d 502, 506 (9th Cir.1997). Once a claim is staked, the holder “has the exclusive right to possession and enjoyment of all the surface included within the lines of the locations, but the United States retains title to the land. This possessory interest entitles the claimant to ‘the right to extract all minerals from the claim without paying royalties to the United States.’ ” Id. (quoting Swanson v. Babbitt, 3 F.3d 1348, 1350 (9th Cir.1993)) (internal citation omitted). “If a discovery of a ‘valuable mineral deposit’ is made, the claim can be held indefinitely so long as the annual assessment work is performed, the necessary filings are made, fees are paid, and a valuable mineral deposit continues to exist.” Id. It is well-established that “[t]he owner of a mining claim owns property, and is not a mere social guest of the Department of the Interior to be shooed out the door when the Department chooses.” Shumway, 199 F.3d at 1103; accord United States v. Locke, 471 U.S. 84, 86, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985) (“[A]n unpatented mining claim remains a fully recognized possessory interest.”). In other words, a mining claim, without more, still involves significant mining rights.
The holder of a mining claim may apply for a patent to the land under 30 U.S.C. § 29, which, if issued, conveys fee title to the public land in favor of the claim holder. See Curtis-Nev. Mines, 611 F.2d at 1281. This process is called “patenting” or proving the claim and requires a determination whether the claim is valid; i.e., whether “there was a legitimate discovery of a valuable mineral deposit on the land which a prudent man would be justified in developing.” Id. Patenting, however, is not required to develop a claim or to engage in mining or related activities on public land. A claim holder can conduct “prospecting, mining or processing operations and uses reasonably incident thereto” without ever obtaining a patent. 30 U.S.C. § 612(a); Curtis-Nev. Mines, 611 F.2d at 1281-82 (“[CJlaimants could continue mining activities on the claims, without ever obtaining a patent. As a practical matter, mining claimants could remain in exclusive possession of the claim without ever proving a valid discovery or actually conducting mining operations.”).
Mining activities are always subject to governmental oversight and regulation and must comply with a panoply of federal, state, and local laws, including the Clean Air Act, the Clean Water Act, and the Solid Waste Disposal Act, among myriad other regulatory requirements. See 43 C.F.R. § 3809.420. Before engaging in mining operations beyond casual use on public land, a claim holder must submit a proposed plan of operation, an MPO, for consideration and approval by the BLM, see id. § 3809.11 — a point upon which the majority improperly fixates. Unless “unnecessary or undue degradation of public lands” is found to result from the proposed *656 operation, the BLM will approve a properly filed MPO. Id. § 3809.411(d).
With the exception of a single 480-acre parcel, the totality of the 10,976 acres that comprise the selected lands is completely encumbered by at least one of 751 mining or mill site claims. Asarco holds 747 of these claims. Accordingly, Asarco’s ability to develop its claims on the selected lands and to engage in mining activities and activities incident to mining is firmly established under the Mining Law, predates the Land Exchange proposal, and will continue to exist whether the Land Exchange goes forward or not. It is with this practicality in mind that we should review the BLM’s decision to approve the Land Exchange.
Ill
The Administrative Procedure Act provides the authority for our review, and we may only set aside agency actions that are “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A); see N. Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969, 975 (9th Cir.2006). We have held that an agency’s decision may only be called arbitrary and capricious if:
the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.
Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1448 (9th Cir.1996) (quoting Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). “This inquiry must be searching and careful, but the ultimate standard of review is a narrow one,” Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (internal quotation marks omitted), and “we do not substitute our judgment for that of the agency,” Lands Council, 537 F.3d at 987 (brackets omitted).
Having carefully reviewed and evaluated the record, I cannot agree with the majority’s conclusion that, after fifteen years of consideration and the compilation of a dense administrative record that includes thousands of pages of study and thorough analysis, the BLM shirked its duty to take the requisite “hard look” under NEPA or otherwise acted arbitrarily or capriciously. The law simply does not support the majority’s holding, nor does the record.
A
In considering the proposal, the BLM prepared a draft EIS pursuant to NEPA and, after providing for public review and comment, issued a final EIS in 1999. The BLM had initially considered a variety of alternatives, including the Land Exchange as proposed, various partial exchanges, a No Mining Alternative, and a No Action Alternative (i.e., where the Land Exchange was not approved and the selected and offered lands remained under present ownership, subject to the mining claims which encumber them). For various reasons, the original list of eleven alternatives was narrowed to four that warranted more in-depth study: the Proposed Action, the No Action Alternative, the Buckeye Alternative, and the Copper Butte Alternative.
Among the initially proposed alternatives eliminated from more detailed consideration was the No Mining Alternative. The BLM reasonably explained:
[I]n developing alternatives, BLM concluded that foreseeable mining-related uses of the selected lands are actions *657 common to all alternatives; that is, mining/mine-support uses would likely occur whether any one of the land exchange alternatives were selected or the No Action alternative was selected. This is because a land exchange is not required for mining-related activities to take place on the selected lands. Asarco currently holds the vast majority of the mining claims on the public lands selected for the exchange, and through these mining claims, Asarco has the right to pursue development on the selected lands for mining and mining-related uses.
As the EIS further explained, “[t]he foreseeable uses of the selected lands are mining-related uses and are expected to occur under all alternatives. Mining could occur on private ... lands under a land exchange, on public lands subject to BLM’s 43 CFR 3809 regulations, or through patenting under the Mining Law of 1872.”
The BLM’s assumption that the foreseeable use of the selected lands will involve mining-related activities irrespective of the Land Exchange is well supported by the record and common sense. Not even CBD disputes this conclusion. As noted by the BLM, Asarco already operates on approximately 272 acres of the selected lands pursuant to its mining claims, and four other copper mines in the area are considering expansion of their mining operations into the selected lands. Indeed, the close proximity of the selected lands to the Ray Mine Complex — the third most productive copper mine in the United States, which has been in operation for eighty-five years — coupled with Asarco’s existing rights under the Mining Law and its stated intention to engage in mining activities on the selected lands whether or not the Land Exchange is effectuated, makes this the only reasonable conclusion.
To be fair, my colleagues do not dispute this general conclusion regarding the foreseeability of mining activities or propose a competing, alternative foreseeable use of the selected lands. Nor could they. Rather, their complaint lies in a misreading of the BLM’s careful analysis, which infects the majority’s view of the EIS and the ROD. My colleagues adopt a more drastic position, repeatedly faulting the BLM for simply presuming that mining operations would be “the same for all alternatives,” whether or not there was a land exchange. Amend. Maj. Op. at 640; see also id. at 636, 640, 640-41, 641, 641-42, 642-43, 646-47, 647, 648-49, 649-50, 650. This logical leap distorts the BLM’s reasoned analysis. As Asarco correctly asserted at oral argument, the BLM did no such thing.
In favor of its premise, the majority solely focuses on an isolated phrase from the record, taken entirely out of context. In the section discussing the “Alternatives Considered,” the EIS states: “As explained above, foreseeable uses of the selected lands are assumed to be the same for all alternatives.” Read in the correct context of developing and evaluating alternatives, the statement simply reiterates the unremarkable notion that mining activities would likely occur on the selected lands under all possible alternatives (and that the No Mining Alternative was neither feasible nor realistic) — a point that no one disputes. The majority, however, implies that the entire explanation is contained in a single isolated paragraph, rather than throughout the EIS and the ROD. See id. at 640-41. My colleagues are then free to characterize the BLM’s environmental analysis as unreasoned and inadequate. See id. That is simply not the case.
The manner and intensity of mining and mining-related activity pose an entirely *658 distinct question from whether mining will likely occur on the selected lands. The EIS does not reveal an unwarranted presumption on the part of the BLM that the actual operations would be identical whether or not the Land Exchange is approved. Rather, given Asarco’s representations, the BLM conducted its environmental assessment — a comparative analysis — -under the assumption that mining-related activity on land remaining under federal ownership would be conducted in a manner consistent with Asarco’s existing mining rights under the Mining Law and a host of otherwise applicable federal and state environmental regulations. See Lands Council, 537 F.3d at 1003 (“[W]e will not find a NEPA violation based on the [agency]’s use of an assumption that we approve.”). Because Asarco already holds mining claims to nearly all of the selected lands, the BLM reached the logical conclusion that, to the extent foreseeable, the environmental impacts would be in many ways similar under the various alternatives. Based on the facts of this case, there is nothing improper or even surprising about this reasoning. Indeed, a contrary conclusion would be absurd.
The majority, however, seems focused on the hypothetical, noting that “[t]he manner in which Asarco engages in mining on the selected lands is likely to differ depending on whether the land exchange occurs, and the environmental consequences will differ accordingly.” Amend. Maj. Op. at 647. Of course, the manner in which Asarco’s future mining will occur is dependent on a variety of factors. Mining activities would differ if the worldwide price of copper plummeted, or if particular parcels of land did not contain sufficient quantities of minerals to warrant mining at all. However, the majority’s rumination is unaccompanied by any factual basis from the administrative record. Nor do my colleagues disclose how the inevitable mining activities might materially differ. It is of course axiomatic that NEPA does not encompass all conceivable scenarios. See Weinberger, 454 U.S. at 146, 102 S.Ct. 197 (“[A]n EIS need not be prepared simply because a project is contemplated, but only when the project is proposed.”).
But even assuming the selected lands remained publicly owned, given the facts of this case (namely, Asareo’s continuing mining rights on the selected lands), there is nothing unreasonable or illogical about a conclusion that, while the timing might differ, the ultimate mining-related activities would be substantially similar and in turn result in comparable environmental impacts. On the contrary, in light of the variables in play, that conclusion is quite sound.[6] My colleagues’ position is prem *659 ised on an inflated portrayal of the MPO process. Given the substantial rights and interests provided by the Mining Law and its goal of encouraging the location and extraction of valuable minerals, the BLM’s review of a claim holder’s proposed MPO is limited. The BLM may disapprove or withhold approval of a properly submitted MPO concerning an area open to mining only if a proposed operation “would result in unnecessary or undue degradation of public lands.” 43 C.F.R. § 3809.411(d)(3); see 43 U.S.C. § 1732(b). “A reasonable interpretation of the word ‘unnecessary’ is that which is not necessary for mining. ‘Undue’ is that which is excessive, improper, immoderate or unwarranted.” Utah v. Andrus, 486 F.Supp. 995, 1005 & n. 13 (D.Utah 1979) (noting that “[t]he word ‘impair’ would prevent many activities that would not be prevented by the language of ‘unnecessary or undue degradation’ ”).
The BLM is, for example, “under no legal obligation to determine mining claim or mill site validity before approving a proposed plan of operations to explore for or develop minerals on lands open to the Mining Law’s operation.” Legal Requirements for Determining Mining Claim Validity Before Approving a Mining Plan of Operations, Op. DOI Solicitor General, M-37012 (Nov. 14, 2005); see W. Shoshone Def. Project, 160 IB LA 32, 56 (2003) (“BLM generally does not determine the validity of the affected mining claims before approving a plan of operations.”).[7] If the BLM finds no unnecessary and undue degradation, and the claim holder has obtained all required permits, the BLM must authorize the planned mining operations.
Indeed, it is the majority — not the BLM — that has engaged in improper conjecture and has adopted unfounded presumptions. Substantial governmental regulations — such as the Clean Air Act, the Clean Water Act, and various other federal and local safeguards — remain applicable to operations on private land. Today’s opinion, based on a distaste for the particular industrial goals at issue, requires that courts presume that in the absence of the MPO process, mining companies will conduct their activities unsupervised by any environmental regulator in a manner that unnecessarily and unduly degrades the environment. And, in doing so, my colleagues assume that mining companies will somehow evade the substantial state and federal governmental regulations that remain applicable to mining operations on private land in Arizona.
But it gets much worse. Here, because Asarco has neither engineered nor submitted an MPO for the selected lands, a foreseeable use plan was instead developed by the BLM as the basis for analyzing the land exchange proposal and the potential environmental consequences. As the BLM Arizona State Director noted in the Protest Decision, rejecting CBD’s arguments:
BLM considered future mining as allowed by the Mining Law, subject to full compliance with 43 C.F.R. Part 3809, as the foreseeable use under all exchange alternatives and the no-action alternative. ... Based upon a foreseeable use plan (FEIS 2.2; Tables 2-5, 2-6; Figures 2-7, 2-8, 2-9), BLM analyzed the direct, indirect and cumulative impacts of future mining within the limits of the *660 information available.... BLM also identified how mining development by Asarco requires other major environmental permits under the jurisdiction of other federal and state agencies (FEIS, Section 1.6.4 and Table 1-5), whether or not the lands remain federal or in private ownership.
While not an MPO approved in accordance with the “unnecessary or undue degradation” standard, the foreseeable use plan developed for the Land Exchange reasonably approximated Asarco’s planned mining-related activities and considered the ongoing regulation of anticipated mining activities whether or not the exchange was approved. Cf. Am. Rivers v. FERC, 201 F.3d 1186, 1195 (9th Cir.1999) (“[Ojnce we are satisfied that a proposing agency has taken a ‘hard look’ at a decision’s environmental consequences, our review is at an end.” (internal quotations and brackets omitted)). The BLM plainly stated: “Mining plans of operations are not required for a land exchange proposal.”
This, however, is not enough for the majority. My colleagues fault the BLM for failing to comply with obligations newly created in this opinion. After all, they do not, nor could they, challenge the BLM’s environmental impact analysis in light of the information at hand. Recognizing that detailed findings cannot be drawn from nonexistent information about future events not yet planned, my colleagues impose their view of what steps the BLM should take under NEPA whenever preexisting mining rights are involved, even where actual mining is speculative or the contours of planned mining activities are undefined. The opinion proclaims that, to satisfy NEPA, “the BLM must make a meaningful comparison of the environmental consequences of Asarco’s likely mining operations with and without the requirement that MPOs be prepared by Asarco and approved by the BLM.... ” Amend. Maj. Op. at 646. As discussed extensively above, that is exactly what the BLM did in this case.
In holding that the BLM failed to conduct such a comparison, the majority has essentially determined that in order to fully comprehend “the different environmental consequences” of the Land Exchange, NEPA requires an analysis that mimics the MPO submission and approval process. Id. Does it? The majority provides no authority for such a landmark holding, leaving the legal basis for this novel NEPA requirement steeped in mystery. The majority then labels the BLM’s decision arbitrary and capricious, because the agency did not conduct this newly minted judicial comparison process. Id. The reason why the parties might not have engaged in the majority’s novel quasi-MPO process as part of the Land Exchange is readily apparent.
As discussed above, the BLM quite clearly did conduct a comparative analysis of the environmental impacts under the various alternatives, including the No Action Alternative. The majority is simply dissatisfied with the results and therefore seeks to mask its imposition of a new MPO requirement into the land exchange consideration process with the false statement that the BLM failed to make a meaningful comparison of the environmental consequences of the various alternatives studied. Ultimately this is all based on the false presumption that some undefined additional comparison would lead to substantially different findings.
What is more, the BLM did consider an alternative similar to the novel quasi-MPO requirement announced by the majority. Among the eleven alternatives initially considered in the EIS, the BLM evaluated the Mining Plan of Operation Alternative. “Under this alternative, Asarco would sub *661 mit an MPO, as described in federal regulations governing mining operations on federal lands [pursuant to 43 C.F.R. § 3809].” The BLM, however, rejected this alternative from further consideration, because Asarco had not yet prepared a detailed proposed plan of operations, and because, in the BLM’s view, an MPO was neither necessary to reach an informed conclusion nor required by the law it administers. Once again, this part of the record draws no attention from my colleagues, and the agency’s interpretation of its regulations is given no Chevron deference. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
This attempt to regulate agency action by judicial fíat quite clearly exceeds our authority. As we have held time and again, “[w]e are not free to ‘impose upon the agency [our] own notion of which procedures are “best” or most likely to further some vague, undefined public good.’ ” Churchill County v. Norton, 276 F.3d 1060, 1072 (9th Cir.2001) (quoting Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 549, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). “Nor may we impose ‘procedural requirements not explicitly enumerated in the pertinent statutes.’ ” Lands Council, 537 F.3d at 993 (quoting Wilderness Soc’y v. Tyrrel, 918 F.2d 813, 818 (9th Cir.1990)) (brackets omitted). But despite insisting that the majority’s decision is consistent with Lands Council, it is just the opposite. According to today’s opinion, the BLM was obliged to determine the exact environmental consequences under hypothetical future MPOs for hypothetical future mines and compare them to the environmental consequences of hypothetical future mines not subject to the MPO requirement. Essentially, the BLM must demand that Asarco fully explore the selected lands, develop a detailed mining plan, and submit a proposed plan of mining operations for approval — one mimicking an MPO. The BLM is then required, under NEPA, to consider that quasi-MPO as if it were in fact a filed MPO under the Mining Law. Stated in real terms, the approval process of a proposed land exchange under FLPMA henceforth incorporates, by way of NEPA, the Mining Law’s governance of mining activities on public lands. But, of course, the majority will not say that if Asarco does all this, it will have complied with the Mining Law.
I find no legal basis for this newly-minted, quasi-MPO requirement — “a creature of judicial cloth, not legislative cloth, ... not mandated by any of the statutory or regulatory provisions upon which [the majority] relied.” Weinberger, 454 U.S. at 141, 102 S.Ct. 197. “Lands Council teaches that our proper role is simply to ensure that the agency, in its expertise, made no clear error of judgment rendering its action arbitrary and capricious.” Nw. Coal. for Alternatives to Pesticides v. EPA 544 F.3d 1043, 1060 (9th Cir.2008) (Ikuta, J., concurring in part, dissenting in part). Just as “we defer to the Forest Service as to what evidence is, or is not, necessary to support wildlife viability analyses,” Lands Council, 537 F.3d at 992, we must defer to the BLM as to what evidence is, or is not, necessary to support a foreseeable environmental impact assessment of anticipated and continuing mining activities in order to make an informed “public interest” determination. See also Coeur Alaska, Inc. v. Se. Alaska Conservation Council, - U.S. -, 129 S.Ct. 2458, 2473, 174 L.Ed.2d 193 (2009) (noting deference given to agencies’ interpretations of own regulatory scheme). My colleagues clearly disagree. Who needs Chevron deference? Why adhere to Lands Council? Judges will now administer the duties Congress *662 has entrusted to the administrative agency-
In sum, the majority’s creation of the novel quasi-MPO requirement grossly oversteps our role in reviewing agency action and is irreconcilable with our precedent. Indeed, it signals a return to the type of overly zealous scrutiny applied in Ecology Center, Inc. v. Austin, 430 F.3d 1057 (9th Cir.2005), which we expressly overruled in Lands Council. See 537 F.3d at 990. As was the ease in Lands Council, the agency “is at liberty, of course, to [conduct further analysis] if it deems it appropriate or necessary, but it is not required to do so.” Id. at 991-92. It is certainly not for us as Article III judges to feign superior expertise in such specialized areas and to micro-manage agencies in executing their congressionally delegated administrative functions.
The majority attempts to evade the clear language of our unanimous en banc opinion in Lands Council by arguing that “[t]he NEPA issue in the case now before us is quite different from the NEPA issues in Lands Council.” Amend. Maj. Op. at 648. That is as true as it is irrelevant. The common issue in Lands Council and in our case is the level of deference due an agency decision under NEPA. That level of deference is just as applicable to the BLM’s “comparison among alternatives” as it is to the Forest Service’s “failures to discuss scientific uncertainty, to cite adequate evidence, or to examine adverse impacts.” Id. The majority declares that the BLM failed to make such a comparison here. Id. at 648-49. As discussed above, that is simply not the case; the majority just does not like the conclusion reached by the BLM after the comparison was made.
NEPA is a procedural mechanism. Lands Council, 537 F.3d at 992 (noting that a substantive requirement “cannot be derived from the procedural parameters of NEPA” (quoting Ecology Ctr., 430 F.3d at 1073 (McKeown, J., dissenting))). It was satisfied here. The BLM did what was required of it under the circumstances of this case — it took a “hard look” at the reasonably foreseeable environmental consequences of the exchange and the various alternatives. We should have applied an “approach [that] respects our law that requires us to defer to an agency’s determination in an area involving a high level of technical expertise,” id. at 993 (internal quotation marks omitted), and rejected CBD’s challenge under NEPA.
B
The majority opinion’s curt analysis regarding FLPMA is perhaps even more problematic and falters for the reasons stated above. Rather than engaging the material legal question whether or not the Land Exchange was in the public interest, see 43 U.S.C. § 1716(a), my colleagues repeat their flawed NEPA analysis, stating: “The manner in which Asarco engages in mining on the selected lands is likely to differ depending on whether the land exchange occurs, and the environmental consequences will differ accordingly.” Amend. Maj. Op. at 647. Despite the BLM’s well-articulated bases for its approval of the Land Exchange, the majority declares that this alone renders the reasoned “public interest” determination arbitrary and capricious.
That declaration ignores the fact that, in the ROD, the BLM gave five main reasons why approval of the Land Exchange was in the public interest and thus satisfied § 206 of FLPMA:
1) Facilitating better land management by acquiring private lands within special areas of designation (the McCracken Desert Area of Critical Environmental Concern (ACEC) which exhibit a “checker board” land ownership pattern and *663 removing inholdings from the Mt. Tipton Wilderness). This will remove resource and use conflicts, facilitate a more efficient management, and enable better implementation of resource management plan (RMP) decisions for the Kingman RMP:
2) Improving wildlife and ACEC habitats by adding the Gila River at Cochran parcel and McCracken ACEC parcels to federal protection and management. The Gila River parcel (320 acres) supports threatened and endangered species by providing critical habitat for the cactus ferruginous pygmy-owl and occupied habitat for the southwestern willow flycatcher. The McCracken ACEC provides 6,500 acres of Category I desert tortoise habitat. The Sacramento Valley and Tomlin parcels also support Category I and II desert tortoise habitat.
3) Supporting resource objectives for improving riparian zones by acquiring parcels along the Big Sandy and Gila Rivers. Tomlin Parcel # 4 and the Gila River at Cochran Parcel contain riparian values and enable more efficient and effective management of riparian zones along those rivers.
4) Continuing to support mining activities as approved in the Phoenix RMP. The exchange provides lands which will enable Asarco to plan expansions, comply with environmental permits, buffer operations from surrounding lands, and continue operating on parcels with ap~ proved mine plans of operations (MPOs) authorized under 43 CFR 3809.
5)Improving management of mineral rights by removing split estate lands from BLM administration (2,808 acres) of federal estate below state or private surface and from parcels with existing operations under approved MPOs. This does not alter federal permits from other agencies administering significant environmental programs such as the Clean Water Act and Clean Air Act.
“As an additional rationale for approving the land exchange,” the ROD also noted that “the continuation of mining [was] the foreseeable use of most of the selected lands whether the exchange occurs or not.” In reaching this conclusion, the BLM referred to the Mining Law and Asarco’s rights arising from its 747 mining claims, Asarco’s pending patent application for portions of the selected lands (which, if approved, would convey fee title to Asarco), mineral potential reports indicating the presence of ore bodies that may have economic potential for future mining, and the current use of parcels in the neighboring Ray Mine Complex, which was 100% mining-related.[8]
Moreover, the ROD recognized that, under the No Action Alternative, the BLM must anticipate substantial future management actions, including processing multiple MPOs and patent applications, while the offered lands would remain in *664 Asarco’s ownership and most likely be divided into smaller parcels and sold for profit. In other words, significant portions of the selected lands would inevitably be burdened by mining-related activities, either pursuant to Asarco’s mining claims or after fee title was conveyed to Asarco through the patenting process. Simultaneously, the offered lands, which would provide significant public benefit under federal ownership (e.g., as described in paragraphs (1) through (3), quoted above), would remain in private hands and likely be subject to subdivision and private development, including possible mining activities. How could the public interest possibly be served by this outcome? This reality weighed heavily in the BLM’s determination.
The majority’s analysis literally ignores the reasons provided in the ROD and the sound logic of the BLM in determining which course best serves the public interest. Indeed, it further ignores the Protest Decision of the BLM Arizona State Director, upholding the BLM’s public interest determination, and the IBLA’s expertise and experience in denying CBD’s administrative appeal. See Ctr. for Biological Diversity, 162 IBLA 268 (2004).[9] Finally, it ignores the district court’s summary judgment in favor of Asarco and the BLM, rejecting as a matter of law CBD’s continued objection to the Land Exchange. Instead, the opinion focuses solely on the “additional rationale” that the BLM mentioned in further support of its determination. Based entirely on their suspicion that the mining activities “may” differ depending on whether the Land Exchange is consummated, my colleagues hold that the extensive agency analysis approving the Land Exchange was, in its entirety, arbitrary and capricious.
I cannot agree with this result, which seems uninterested in the BLM’s actual “public interest” determination. Nor can I condone an approach that gives short shrift to the deference judges are supposed to apply to agency action review under our en banc decision in Lands Council. As previously discussed, there was nothing improper about the BLM’s evaluation of the foreseeable use of the selected lands. Even if there were gaps or imperfections in the BLM’s analysis, the agency action here still does not rise to the level of an arbitrary or capricious determination.
IV
In reaching its result, the majority focuses almost exclusively on the regulatory mechanism behind MPOs, while at the same time diminishing or ignoring altogether Asarco’s substantial preexisting *665 mining rights under the Mining Law, the standard for and purpose of FLPMA land exchanges, and the state and federal environmental regulations that remain applicable to the selected lands whether under private or public ownership. The thrust of the opinion relates to the difference in governmental oversight of mining operations conducted on federal versus non-federal lands, i.e., whether prior agency approval of mining plans is required. This demonstrates a clear distrust of Asarco and the BLM — a distrust unsupported in the extensive record before us.
The majority is plainly concerned about the unavoidable uncertainty regarding the ultimate environmental impacts that will occur, which admittedly could be substantial and perhaps different than estimated in the EIS. Apprehension over a speculative outcome should neither drive a particular result nor prompt the creation of bad law.[10] Unfortunately, my colleagues have succumbed to this temptation and, in doing so, have sacrificed the integrity of our precedent and the best interests of the public in order to achieve a particular outcome in the instant case.
The majority’s holding is shortsighted and unreasonably impairs the BLM’s ability to effectively manage the public lands in a manner that we all desire. In practice, the newly minted quasi-MPO requirement will unquestionably stifle, if not altogether stymie, land exchanges, especially whenever mining companies are involved or mining-related activities are contemplated. Indeed, this judicially created obstacle would be, in application, an impenetrable wall.
Furthermore, by grafting this time-consuming and expensive process onto FLPMA’s “public interest” determination (ostensibly though NEPA), our opinion today eliminates one key incentive that encourages private landowners, such as Asarco and other mining claim holders, to offer their valuable private property in exchange for federal land. Like it or not, most businesses are driven largely by economic considerations. At some point, claim holders will elect to simply exercise their rights under the Mining Law to the offered lands and proceed through the MPO or patenting process in order to engage in mining activities and to simultaneously develop or market their valuable private lands for additional commercial gain. Then what? The public would be deprived of the offered lands, which are undisputedly superior in almost all respects (except for mineral deposits) to the selected lands — a collection of scattered parcels near an active, large-scale mining operation, which are, and which will continue to be, heavily burdened by mining claims. In addition to being legally untenable, the majority’s approach announced today is impractical, misguided, and contrary to the best interests and welfare of the public at large.
It is not the personal opinions of judges that matter in determining whether the Land Exchange is in the best interests of the public. See Amend. Maj. Op. at 650. What matters is whether the agency followed a reasonable process in reaching its conclusion. The BLM determined that the Land Exchange was in the public interest, as required by FLPMA, for all the reasons detailed above. As summarized in the ROD, the offered lands “have high public *666 values for: wilderness inholdings ...; riparian zones ...; other habitat supporting threatened and endangered or special species; and cultural and recreation values. The public interest will be served by making the exchange.”
y
The BLM’s conclusion that the foreseeable use of the selected lands includes mining activities and related uses is certainly supported by substantial evidence in the record. See Dickinson v. Zurko, 527 U.S. 150, 163-64, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (noting that the standard is even more deferential than the clearly erroneous standard of review). Neither NEPA nor FLPMA requires that Asarco prepare and submit a quasi-MPO or that the BLM conduct a quasi-MPO approval process in order to determine whether a proposed land exchange is in the public interest.
I would faithfully apply our precedent and affirm the district court’s summary judgment in favor of the BLM and Asarco. Today’s opinion embodies the type of judicial meddling in agency action that we intended to put to rest in Lands Council. Its implications are far-reaching and severe. I respectfully dissent. Has anyone seen the canary?

. Before engaging in mining operations beyond casual use on public land, a claim holder must submit an MPO for consideration and approval by the BLM. 43 C.F.R. § 3809.11. An MPO sets forth detailed explanations of the scope and impact of mining activities that will exceed a certain size. See Amend. Maj. Op. at 643-44 (quoting 43 C.F.R. § 3809.401 extensively).

. As in the majority opinion, "selected lands” refers to the 10,976 acres of public land at issue, and "offered lands" refers to the 7,300 acres of private land currently owned by Asarco subject to the Land Exchange. The offered lands are comprised of eighteen parcels located in Pinal and Mohave Counties and include: (1) the Gila River Parcel at Cochran, (2) the Sacramento Valley Parcel, (3) the Knisely *652 Ranch parcel group, (4) the Tomlin parcel group, and (5) the McCracken Mountains parcel group.

. In Weinberger, the Court reversed our panel opinion in Catholic Action of Hawaii/Peace Education Project v. Brown, 643 F.2d 569 (9th Cir.1980).

. Despite the majority opinion’s selective and somewhat misleading presentation of the facts, the record reveals — and CBD does not contest — that from an environmental standpoint, the selected lands are far inferior to the offered lands that would come under federal ownership through the Land Exchange. As stated in (he record, "The BLM prepared a careful and reasonable analysis of the natural resources lost and gained in the proposed land exchange.... In each instance, the natural resource inventory detailed in the FEIS [demonstrates that] the offered lands presented evidence of superior resource values compared to the selected land parcels." Moreover, the less environmentally valuable selected lands, which are comprised of scattered parcels that largely border the active Ray Mine Complex, are apparently rich in copper and silver — minerals in high demand by our technology-driven economy.

. The Mining Law codified the informal system of acquiring mining claims on public land by prospectors in California and Nevada from the late 1840s through the 1860s. See Shumway, 199 F.3d at 1097-99.

. The majority asserts that the BLM’s position here — that environmental impacts would be similar under the various alternatives whether or not MPOs are filed — is inconsistent with the position it took in Mineral Policy Center v. Norton, 292 F.Supp.2d 30 (D.D.C.2003). See Amend. Maj. Op. at 645, 648-49. That is simply untrue, and its chastisement of the Department of the Interior is inappropriate. In Mineral Policy Center, the BLM argued that the MPO process allows it to exercise case-by-case discretion, which is one of many tools used to protect the environment with regard to mining operations on public lands. 292 F.Supp.2d at 44 (citing, inter alia, the Endangered Species Act, 16 U.S.C. §§ 1531-1534; the Archeological Resources & Protection Act, 16 U.S.C. §§ 470aa-470mm; the Clean Water Act, 33 U.S.C. §§ 1251-1387; and the Comprehensive Environmental Response, Control & Liability Act, 42 U.S.C. §§ 9601-9675). That statement is not inconsistent with the BLM’s reasoning in this case. The BLM’s conclusion that Asarco's mining-related activities would be similar even without the MPO process does not mean that the MPO process is generally meaningless. It simply shows that when the BLM looked into the necessarily uncertain future in examining this particular land exchange, its expertise led it to believe that the environmental consequences *659 would be similar whether Asarco mined on public or private land.

. As the majority asserts, the MPO review process does trigger procedures established by the BLM and will typically involve an environmental analysis subject to NEPA. See 43 C.F.R. § 3809.411(c). Still, the limited “unnecessary and undue degradation” standard governs the MPO approval process, and NEPA operates within these restraints.

. Despite the BLM’s meaningful discussion on the topic, the majority curiously proclaims that the ROD did not address the objection raised by the EPA, the Bureau of Indian Affairs, and the Sierra Club to the BLM's assumption that the foreseeable use of the selected lands will be mining, whether or not the exchange occurs. See Amend. Maj. Op. at 640-41, 649 (accusing the BLM of "not responding] to the second sentence” of the objection). In direct response to that objection, the ROD cited the “FEIS General Response Section 7.4.5 and 7.4.6,” as the opinion acknowledges, and went on to explain that mining is already an “approved use” under the current resource management plan and that analysis “indicated that mineral development would continue or increase" in the selected lands. Finally, the ROD referenced, in an immediately following sentence, the "FEIS sections that deal with the foreseeable uses in the absence of mining plans of operations,” which are discussed above.

. The majority selectively quotes language from the concurring opinion, claiming that it supports its wayward NEPA analysis. See Amend. Maj. Op. at 640-41 (quoting Ctr. for Biological Diversity, 162 IBLA at 291 (Hemmer, Admin. J., concurring)). But the majority omits the paragraph immediately following the quoted text, which fully conveys Administrative Judge Hemmer's concurrence in the result reached by the IBLA:
Nonetheless, I agree with the lead opinion that [CBD's] arguments do not sufficiently take into account the record and the mining uses of the land evident therein, nor the above-described facts, in suggesting that mining would be entirely different if the selected lands were not transferred outside of Federal ownership and that BLM thereby did not adequately identify the effects of the proposed action.
162 IBLA at 291 (Hemmer, Admin. J., concurring). Thus, whether or not she believed that the BLM might have been able to conduct a more thorough environmental analysis, see Amend. Maj. Op. at 640-41, 645-46, 648-49, she determined that such an analysis was not required by law. The majority today nonetheless engrafts that requirement onto the statute under the guise of interpreting it.

. I also note that a mining company could theoretically deviate from an approved MPO or quasi-MPO after a land exchange is effectuated once the public land is conveyed to private ownership. Therefore, I suspect that the majority’s new NEPA hurdle does not resolve its concerns and, practically speaking, serves no legitimate purpose other than to defeat the Land Exchange.